**BOSTON PROFESSIONAL HOCKEY ASSOCIATION, INC.**

v.

**Gerry CHEEVERS.**

**BOSTON PROFESSIONAL HOCKEY ASSOCIATION, INC.**

v.

**Derek SANDERSON.**

**Civ. A. Nos. 72–2484–C, 72–2490–C.**

United States District Court,
D. Massachusetts.

Sept. 28, 1972.

Joseph W. Bartlett, Daniel B. Bickford, James J. Marcellino, Ely, Bartlett, Brown & Proctor, Boston, Mass., for plaintiffs.

Edward B. Hanify, John Silas Hopkins, III, Richard P. Ward, Ropes & Gray, Boston, Mass., for Gerry Cheevers.

Roger P. Stokey, Kenneth A. Cohen, Goodwin, Procter & Hoar, Boston, Mass., for Derek Sanderson.

## MEMORANDUM and ORDER

CAFFREY, Chief Judge.

Two separate civil actions for breach of contract were filed in the Superior Court of Massachusetts in and for the County of Suffolk in August 1972 by the Boston Professional Hockey Association, Inc. (hereinafter the "Bruins"). Gerry Cheevers is named as defendant in the first case (Civil No. 72–2484–C), and Derek Sanderson is named as defendant in the second case (Civil No. 72–2490–C). Thereafter, both cases were removed to this court on the basis of diversity of citizenship, both defendants being citizens of Canada and the plaintiff being a corporation organized under the laws of Massachusetts with a principal place of business in the City of Boston. The complaint in each action alleges that the amount in controversy exceeds the sum of $10,000. The two cases were consolidated for hearing on plaintiff's application for a preliminary injunction and a hearing was held on September 8, 1972, at which testimonial and documentary evidence was adduced.

In Civil Action No. 72–2490, in which Sanderson is the defendant, a motion to intervene filed by the Philadelphia World Hockey Club, Inc. (hereinafter the "Blazers"), a corporation organized under the laws of the State of New Jersey, was allowed pursuant to Rule 24, Federal Rules of Civil Procedure. Sanderson has recently signed a contract to play hockey for the Blazers in the upcoming hockey season scheduled to begin in October, 1972, which will be the first season for the Blazers and for the World Hockey Association.

Prior to the hearing on September 8, the Honorable Levin H. Campbell of this court held a hearing on August 14 on motions for temporary restraining orders in both cases, and on August 17

Judge Campbell entered an order denying a temporary restraining order as against Cheevers and directing counsel to confer with reference to entering into a stipulation regulating activities by Sanderson between that date and the date of the hearing held on September 8. On August 30, a stipulation was filed in court, in effect restraining Sanderson from making any appearances, promotional or otherwise, on behalf of the World Hockey Association between August 30 and September 7, 1972. At the conclusion of the hearing held on September 8, an order was entered pending the filing of this Memorandum and Order which directed that neither player would make any appearances or perform any actions on behalf of hockey teams in the World Hockey Association prior to October 1, 1972.

The Bruins seek at this stage of the case a preliminary injunction enjoining both defendants from (a) playing hockey for any professional hockey club other than the Boston Professional Hockey Association, Inc., and (b) aiding, promoting, sponsoring, coaching, managing, or otherwise assisting any other professional hockey club in derogation of their duties of loyalty and promotional assistance to the Bruins. The narrow question presently before the court is whether or not the Bruins have made a showing that, at this stage of the case, they are entitled to the injunctive relief set out above.

■ The test to be applied by this court in deciding whether or not the Bruins have shown themselves entitled to injunctive relief on the basis of the oral and documentary testimony adduced at the September 8 hearing consists in the court's making a determination whether the Bruins have shown (1) that immediate and irreparable harm will result to them if the court declines to issue an injunction, and (2) that there is a probability that they will ultimately prevail after a full trial on the merits. Automatic Radio Mfg. Co. v. Ford Motor Co., 390 F.2d 113, 115 (1 Cir. 1968), cert. denied 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968); Cuneo Press of New England, Inc. v. Watson, 293 F. Supp. 112, 115 (D.Mass.1968); Ohio Oil Company v. Conway, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972; Celebrity, Inc. v. Trina, Inc., 264 F.2d 956, 958 (1 Cir. 1959); Flood v. Kuhn, 309 F. Supp. 793, 801 (S.D.N.Y.1970).

These issues must be resolved upon the basis of the following facts. The Bruins are a professional ice hockey team which has represented Boston in the National Hockey League, an unincorporated association of ice hockey clubs, for a period of years extending well back beyond World War II. The World Hockey Association is an association of ice hockey clubs which was formed in 1971.

Defendant Sanderson is a member of the National Hockey League Players Association. He has been a standout center for the Bruins for the last several years. His abilities are rated as outstanding by Coach Tom Johnson of the Bruins and by any qualified observer of professional hockey players. Defendant Cheevers has tended goal for the Bruins for the last several seasons and is also a member of the National Hockey League Players Association. His abilities are best described in testimony of Coach Johnson, who observed that there is no better goalie presently active on any professional hockey team. The fact that he played 32 consecutive games during the most recent hockey season without a loss is known not only to Francis Dahl's "Bostonian who never followed baseball," but also to those very few Bostonians who never followed hockey. For purposes of this ruling I accept Coach Johnson's testimony that both Cheevers and Sanderson are hockey players in the super-star category, and by so doing the Court agrees with practically every hockey "buff" in Boston, Massachusetts and New England.

Both Cheevers and Sanderson signed National Hockey League Standard Player's Contracts in September of 1971. The standard form contract provided that the Bruins would employ each of

them "as a skilled hockey player for the term of one year commencing October 1, 1971." Both contracts expire by their own terms on September 30, 1972. However, both contracts contain the so-called reserve clause which appears as Clause 17 in both players' contracts. Clause 17 provides as follows:

"17. The Club agrees that it will on or before September 1st next following the season covered by this contract tender to the Player personally or by mail directed to the Player at his address set out below his signature hereto a contract upon the same terms as this contract save as to salary.

"The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement."

The standard form contract also contains the following language in Clause 6 thereof:

"6. The Player represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages. The Player therefore agrees that the Club shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunction proceedings from playing hockey for any other team and/or for any breach of any of the other provisions of this contract."

At the hearing, evidence was offered and I find that the Bruins tendered new Standard Form Contracts to both Sanderson and Cheevers. The contract tendered to Sanderson offered him a salary for the year beginning October 1, 1972 in the amount of $80,000, plus certain additional payments in the nature of bo-

nuses contingent on his achieving a certain performance by way of goals scored or points scored, short-handed goals scored, etc. The contract tendered to Cheevers called for a salary of $70,000 for one year, plus certain bonuses contingent on his goals-against average, the number of shutout games that he plays in, etc. Both players declined to sign the Bruins' contracts. Instead, Cheevers signed a seven-year contract with the Cleveland Crusaders, calling for a payment to him of $200,000 a year for seven consecutive years ($1,400,000), plus a variety of bonuses contingent on the place in the league standing in which the team finishes and on his performance as goalie each season, and Sanderson signed a ten-year contract with the Philadelphia Blazers, calling for a payment to him of $2,325,000 over the ten-year period, payable in annual salaries of $300,000 for the first two years, $200,000 for the next five years, $225,-000 for the eighth year and $250,000 for the last two years.

Sanderson's contract with the Blazers also obligates the Blazers to pay all legal costs and expenses of any litigation brought by either the National Hockey League or the Bruins, and his contract, in paragraph VI.2, requires the Blazers to pay him his full salary for the first two years even if he is enjoined by court decree from playing with the Blazers. The contract reserves to the Blazers the right to terminate the contract with Sanderson after two years if he has been enjoined permanently from playing with the Blazers. The contract further provides that if Sanderson is required by a court decree to play for the Bruins or other National League team, the obligation of the Blazers to Sanderson is to be diminished in proportion to the amount of salary paid to him by the National League team for which he plays during the two years of his contract with the Blazers. A similar provision covering only the 1972–73 season appears in Cheevers' contract with the Cleveland Crusaders.

Turning to the first of the two requirements which a movant for injunctive relief must establish, i. e., probability of ultimate success on the merits, the first question to be determined is whether or not the contracts presently in existence between the Bruins and both defendants are valid and legally enforceable contracts. The determination of the legal validity of the standard form National Hockey League Player's Contract must be evaluated in the light of the contention raised by both defendants that the contract is illegal and unenforceable because Clause 17 thereof, on which plaintiff relies in its claim that there is still a contractual relationship between the parties, violates the federal antitrust laws—specifically, Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, in that to the extent the reserve clause binds a player to the one National Hockey League team for so much of his entire hockey-playing life as that team elects to keep him in its service, that clause operates as a restraint on trade.

The Bruins contend, in effect, that hockey players' contracts are not subject to the federal antitrust laws, and that the enforceability and validity of the contracts are not to be measured in terms of the Sherman Act. The Bruins argue that the existence of a valid collective bargaining relationship immunizes certain practices common to professional sports from the scope of the antitrust laws.

A reading of the four opinions filed by Justices of the Supreme Court in Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) make it abundantly clear that the only major league professional sport whose player contracts and reserve clause system have been ruled exempt from coverage by the federal antitrust laws is the sport of professional baseball. The opinions of the Court make it more than abundantly clear that the granting of immunity under the antitrust laws to the sport of baseball is a historical accident and an anomaly based on historical rather than legal or even rational grounds. It is equally clear from the opinions in United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955), and in Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), that professional boxing and professional football have been held subject to the provisions of the federal antitrust laws, and it is significant to observe that in the majority opinion in Flood v. Kuhn, supra, 407 U.S. at p. 282, 92 S.Ct. at p. 2112, the court states:

"In view of all of this, it seems appropriate now to say that . . . (4) [o]ther professional sports operating interstate—football, boxing, baseball, and, presumably, hockey and golf—are not so exempt."

The foregoing, while not conclusive, appears to this court to make it highly probable and well-nigh a certainty, that all professional sports operating interstate eventually will be ruled by the Supreme Court to be subject to the federal antitrust statutes. Indeed, because of its peculiarly international character, involving several teams in Canada as well as teams in the United States, professional hockey would seem to be the leading candidate for a ruling that it is subject to federal antitrust laws. Thus, although a final decision is not necessary on the point at this stage of the case, it would appear likely that the validity of the contracts between the Bruins and the defendants must be determined on the assumption that the contracts are subject to the provisions of the federal antitrust laws.

The next matter to be considered is whether the Bruins have shown that there is a probability that the National Hockey League Standard Player's Contract will ultimately be ruled to be valid and enforceable under the provisions of federal antitrust law. This, in turn, requires that a ruling be made that the Bruins have shown that there is a probability that these contracts do not oper-

ate to restrain trade in violation of Sections 1 and 2 of the Sherman Act.

■ The validity of the Standard Player's Contract under the antitrust laws is to be determined not merely by reading the contract itself, but the Standard Player's Contract must be considered as a portion of a substantial group of integrated documents all of which cooperate to govern the relationship between amateur and professional hockey players and the member clubs of the National Hockey League.

■ Clause 18 of the Standard Player's Contract contains the provision:

"The club and the player severally and mutually promise and agree to be legally bound by the Constitution and By-Laws of the league and by all the terms and provisions thereof, a copy of which shall be open and available for inspection by club . . . and the player at the main office of the league and at the main office of the club."

In addition, and in fact, the relationship between the member teams of the National Hockey League inter se and the relationship between the member teams and players who have signed Standard Player's Contracts are materially affected by a number of other voluminous documents and agreements.

For example, on June 7, 1967 a "Recognition Agreement" was signed between the owners of the National Hockey League teams and a then newly-formed National Hockey League Players Association. Under the terms of this agreement the owners of the clubs agreed to recognize the Players Association as representatives of the players, authorized to represent the players concerning the players' relationships with the individual clubs. Since that date there have been a number of meetings between representatives of the owners and representatives of the Players Association. These meetings have produced a number of changes in the relationship between individual players and their clubs.

In addition, on May 1, 1968, the National Hockey League entered into a Memorandum of Agreement, some 28 pages in length, with the American Hockey League, the Western Hockey League and the Central Professional Hockey League. (Exhibit 31A in Defendant's Exhibit O) This Memorandum of Agreement inter alia provided (in paragraph 29, Internal Regulations of Leagues):

"a. Each league party to this agreement is free to adopt such constitution and by-laws and league rules or regulations as it may see fit provided always that nothing in such constitution, by-laws, regulations or rules shall conflict with this agreement while it is in force." (emphasis added)

A reading of this paragraph establishes that the force and effect thereof is to make both the Constitution and By-Laws of the National League subject to this paragraph, and to, in effect, make unenforceable any provision of the National League Constitution or By-Laws which is in conflict with this paragraph. The net effect of all this is to make the Standard Player's Contract also subject to this Memorandum of Agreement because the said contract (in paragraph 18) incorporates by reference as part thereof the Constitution and By-Laws of the National Hockey League, which, of course, has been rendered subservient to this Memorandum of Agreement by the above-quoted paragraph 29(a) of the May 1, 1968 Memorandum of Agreement.

The significance of this Memorandum of Agreement on the contract of the players appears in part in paragraph 31 thereof dealing with "Territorial Rights" which gives to signatories exclusive control of the playing of hockey games in its city of operation and within fifty miles of the corporate limits

thereof. Clause 26 of this Memorandum of Agreement provides:

"No member club of any league . . . shall employ . . . any player who, for any cause, is ineligible or who has been expelled by any league or its member clubs."

Clause 28 provides:

"The AHL, WHL and CPHL agree to 'associate' themselves with the National Hockey League in the performance and fulfillment of the terms of the agreement dated May 15, 1967 (and any amendment thereto which has the concurrence of the AHL, WHL and CPHL), made between the NHL of the one part and the Canadian Amateur Hockey Association and the Amateur Hockey Association of the United States of the other part . . . ."

Other documents in evidence establish that elaborate rules are in existence relative to the establishment and maintenance of so-called Reserve List of players, Voluntarily Retired List of players, Training Camp List of players and Negotiation List of players. Section 15 of the By-Laws of the National Hockey League prohibits a member club or any official, player, partner, employee, agent or representative thereof from directly or indirectly tampering, negotiating with, making an offer to, or discussing employment with any employee connected with another member club or any player with respect to whom another member club had either the professional rights or the right to negotiate for said professional rights without the prior written consent of that member club. Section 15.2(a) provides for fines up to $10,000, of which 50% goes to the club interfered with; 15.2(b) prohibits the employment of the person who is the subject of tampering; and 15.2(c) provides for the deferment of the offending club's choice in the draft proceedings (either professional or amateur) next following the offense. The League President has it within his discretion to determine the classification of draft selection and the round of the selection forfeited.

While this opinion could be appreciably proliferated by setting out at length many other paragraphs from the various documents referred to in the preceding pages, it is adequate for present purposes to find, and I do find, that the record establishes that this integrated group of contracts, constitutions, by-laws, and agreements, all of which are in evidence, and which in their totality run to hundreds of pages of legal verbiage, effectively and totally control the careers of any hockey player in the United States or Canada from the time he first joins any organized team which plays in a league on up through amateur leagues, semi-pro leagues, and minor professional leagues, to the major professional hockey league. In light of the fact that this complex system dominates and controls a hockey player's career all of his hockey-playing life as a practical matter, it would be unrealistic to rule that the Bruins have sustained their burden of showing that there is a probability that this tangled web of legal instruments will not be found to restrain trade in professional hockey.

In so deciding I am aware of the Bruins' argument that the Standard Player's Contract is a collective bargaining agreement exempt from the operation of the antitrust laws. I find and rule that this contention has no support in the evidence. There is no document contained in the thousands of pages of this record which establishes that the portion of Clause 17 of the Standard Player's Contract which is commonly known as the reserve clause ever was the subject matter of collective bargaining negotiations between National Hockey League team owners and representatives of the players. The fact that the presence of the reserve clause in the Standard Player's Contract antedates 1967, the year in which the Players Association was founded, appears from the deposition testimony of Charles W. Mulcahey, Jr. (p. 4–90), Vice-president and

General Counsel of the Bruins. Mr. Mulcahey admitted that there was a reserve clause in Cheevers' contract for the 1965–66 hockey season. This evidence puts to rest any contention that the reserve clause is likely to be found to be the product of collective bargaining negotiations. Thus, I find and rule that the Bruins have not shown a probability that these Standard Player's Contracts will be found to be legally valid and enforceable in the face of the serious threat to their legality posed by the provisions of the Sherman Act.

A second portion of the twin burden to be sustained by a movant for injunctive relief is a showing by that party that he will suffer irreparable harm if the injunctive relief is not granted. An exhibit introduced into evidence at the hearing indicates that the Bruins had a "net profit before federal income taxes" for the year ending April 30, 1964, in the amount of $73,781.63, and for the year ending June 30, 1971, an entry reported their "net earnings before federal income taxes" as being in the amount of $1,324,890.89. The balance sheet for the Bruins as of June 30, 1971 showed a surplus in the amount of $2,758,096.85.

During this period there have been two expansions of the number of teams in the National Hockey League, but there has been only a minimal change in the seating capacity of the dilapidated Boston Garden at which the Bruins home games are played. During this same period there has been a fairly substantial increase in the price of tickets for attendance at the Bruins games, and it would appear to be a subject for judicial notice that the television coverage of Bruins games on Channel 38, and occasionally on network television through the CBS network, has increased substantially. This court can judicially notice that all of these television presentations of hockey are commercially sponsored, and Exhibit D introduced at the hearing shows that the net income to the Bruins from television for the year ending June 30, 1971 was in excess of one-half million dollars, specifically, $539,707.91. Other exhibits show that gate receipts for the sale of tickets for the regular season amounted to $1,097,651 in the year ending April 30, 1965, that they amounted to $1,340,002 in the year ending April 30, 1967, that they amounted to $1,968,796 in the year ending June 30, 1969, and that they amounted to $3,144,921 in the most recent season which concluded June 30, 1971.

From the foregoing statistics it would seem a permissible inference that the Bruins are a solidly established commercial operation with an operating income curve which has been moving in an upward direction steadily since at least 1965. The financial situation of the World Hockey Association, a novice league, newly come into existence, is not as yet established. The teams which comprise the World Hockey Association have published a schedule of games to begin in October 1972. None of the games has as yet taken place, and at the hearing Mr. James L. Cooper, President and one of the two principals of the Philadelphia Blazers, testified that the World Hockey Association will not be able to survive financially if it is not able to obtain the services of established hockey stars such as Sanderson, Cheevers, Hull, and other hockey players who have gained reputations as outstanding performers on various teams in the National Hockey League.

Mr. Cooper testified that the World Hockey Association was formed in the latter part of 1971 and that he acquired one of its twelve franchises in 1972 for the City of Philadelphia. The other eleven franchies are located in Edmonton, Winnipeg, Ottawa and Quebec, Canada, and in Boston, New York, Cleveland, Chicago, Minneapolis-St. Paul, Houston, and Los Angeles. An exhibit (Defendants' N) establishes that each of these franchises has leased ice hockey facilities for its home games during the forthcoming hockey season. The first game for this new Association is scheduled for October 10, 1972.

Cooper further testified that he and his partner have invested and personally guaranteed in excess of $5,000,000 because of some, but not all, of the financial obligations of the Blazers. He testified that on the basis of his knowledge as a trustee of the World Hockey Association he would estimate that between $25,000,000 and $30,000,000 has been invested in the twelve franchises. Cooper made the representation that no national league hockey player affiliated under a multi-year contract with any National Hockey League team, or with any minor professional league team, has been approached by or on behalf of the World Hockey Association, and that all former National League hockey players approached or signed by the World Hockey Association have been players whose contracts will expire October 1, 1972, unless the so-called reserve clause (Clause 17) is valid and enforceable for another year.

Finally, Mr. Cooper testified that he was of the opinion that the granting of injunctive relief prohibiting Sanderson and other established hockey stars from playing outside the National Hockey League "would signal the death of the World Hockey Association."

The financial statements in evidence make it manifest that at the present time, and for a number of years past, the Bruins are and have been in a strong, healthy, and steadily improving financial condition. In considering whether or not the Bruins have sustained their burden of showing irreparable harm unless they are granted the desired injunctive relief, it is well to keep in mind that although the plaintiff is popularly called and practically beloved as and under the name of "Bruins," actually the plaintiff is a business corporation formed for profit which is earning a substantial return on its capital. The irreparable harm, the probability of which must be shown by the corporate plaintiff, is harm to its financial and business health. The court is not concerned at this stage of the case with the effect of the injunction on the Bruins'

standing in the National Hockey League or with the chances of the Bruins' successfully repeating their most recent performance in the Stanley Cup Playoffs. Thus, the issue, simply stated, is whether or not irreparable financial harm to the Boston Professional Hockey Association, Inc. has been shown on the record developed thus far.

I find and rule that there has been no showing that the loss of the services of Cheevers and Sanderson will cause irreparable harm to the financial affairs and fortunes of plaintiff. In fact, a finding is appropriate, in light of the financial records in evidence, that the effect to be assigned to the departure of these two super-stars is unknown, and on the present record it cannot be proven that the Bruins will suffer any financial loss whatsoever in their operating revenues, ticket sales, television income, etc., due to the absence of these two players from their team. Furthermore, if the threatened loss of these two defendants from the roster of the Bruins is eventually determined to constitute the breach of a valid employment contract, I rule that there is available to the Bruins a complete and adequate remedy at law, consisting of a suit for money damages for breach of contract against Cheevers and Sanderson, as well as a suit against the third parties, the World Hockey Association, the Philadelphia Blazers and the Cleveland Crusaders, in the nature of an action in tort for interference with advantageous contractual relations.

It is usual practice for a court of equity, called upon to pass on a claim for injunctive relief, to weigh the consequences that the granting of the injunctive relief sought would have on all parties to the litigation. Courts of equity frequently, in resolving a question concerning injunctive relief, try to evaluate the balance of hardships on both parties that would result from the granting or the withholding of the injunction requested.

In the course of the balancing process, this court has weighed the financial ef-

fect that the loss of the services of these two super-stars would have on the Bruins on the one hand, and the effect it would have on the two individual players and the intervening defendant, the Blazers, on the other hand. I find that the balance of hardship favors the defendants, who would suffer a much more serious hardship if the injunction was granted than the Bruins would suffer by the denial of the injunctive relief.

This court is not unaware that it has been held, primarily by the Court of Appeals for the Second Circuit, that

" . . . where the 'balance of hardships tips decidedly toward the party requesting the temporary relief,' the burden of showing probable success lessens to a requirement that he raise 'questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation.' " Flood v. Kuhn, 309 F. Supp. 793, 798 (S.D.N.Y.1970) aff'd 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed. 2d 728 (1972); Checker Motors Corp. v. Chrysler Corporation, 405 F.2d 319 (2 Cir., 1969).

There is no occasion on the facts of the instant case to apply this less stringent test which has been adopted by the Second Circuit because I find that the instant case is not one in which the balance of hardships can be found to tip decidedly toward the party requesting the temporary relief. On the contrary, it would appear that the balance of hardship from injunctive relief herein would clearly run in favor of the defendant hockey players, who have a limited number of high-earning years before them, having in mind their respective ages and the rigors of playing professional hockey with the always-present possibility of career curtailment caused by physical injury.

The testimony of Mr. Cooper also establishes that the balance of hardship tips toward the Blazers because of the "tremendously adverse effect" on their ticket sales from the existing litigation.

In summary, I find and rule that plaintiff has failed to sustain either their burden of showing probability of success on the merits or a probability of irreparable harm if the injunctive relief is denied.

Accordingly, it is ordered:

The motion for a preliminary injunction against Cheevers and Sanderson is denied in their respective cases.