Oscar ROBERTSON et al., Plaintiffs,

v.

NATIONAL BASKETBALL ASSOCIATION, a joint venture, et al., Defendants.

No. 70 Civ. 1526.

United States District Court, S. D. New York.

Feb. 14, 1975.

872

Weil, Gotshal & Manges, by Peter Gruenberger, Ira Millstein, Joel Harris, Mark Jacoby, James Quinn, Robert Weiner, New York City, for plaintiffs.

Proskauer, Rose, Goetz & Mendelsohn by George G. Gallantz, Michael A. Cardozo, David J. Stern, New York City, for defendant NBA.

Spengler, Carlson, Gubar & Churchill by Robert S. Carlson, New York City, Frederick P. Furth, San Francisco, Cal., Meth, Wood, Neff & Cooper by Robert Carey Neff, Newark, N.J., Michael Goldberg, New York City, for defendants ABA.

## OPINION

ROBERT L. CARTER, District Judge.

### I.

#### *History of the Litigation*

A. *Nature of the Action*

This action was instituted in 1970 pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26[1], to recover treble damages, costs and injunctive relief for violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[2] Defendants are the National

---

[1] "§ 4. Suits by persons injured; amount of recovery

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

"§ 16. Injunctive relief for private parties; exception

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . ."

[2] "§ 1. Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

"§ 2. Monopolizing trade a misdemeanor; penalty

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Basketball Association (NBA) and the American Basketball Association (ABA). All the named plaintiffs, William Bradley, Joseph Caldwell, Archibald Clark, Melvin Counts, John Havlicek, Donald Kojis, Jon McGlocklin, McCoy McLemore, Thomas Meschery, Jeffrey Mullins, Oscar Robertson, Westley Unseld, Richard Van Arsdale and Chester Walker were active players with,[3] and the elected player representative of, one of the then 14 clubs of the NBA.[4] Plaintiffs sue on behalf of themselves, all presently active players, those who were active at the time the action was originally commenced, and future players of the NBA. Jurisdiction is asserted under 28 U.S.C. §§ 1331 and 1337.

### B. *Background Facts*

This litigation began after reports in the spring of 1970 of a proposed merger between the NBA and the ABA. Plaintiffs' amended complaint[5] charges defendants with conspiring to restrain competition for the services and skills of professional basketball players through such devices as the college draft, the reserve clause in the Uniform Player Contract (the Uniform Contract), the compensation plan attached to the reserve clause, and various boycott and blacklisting techniques. The complaint further alleges that the NBA and the ABA seek to effectuate a non-competition agreement, merger or consolidation.

In May, 1970, this court (Tenney, J.) preliminarily enjoined the defendants from entering into "any merger, consolidation, or acquisition or combination by any means," except that defendants were permitted to negotiate a proposed merger for the sole purpose of petitioning Congress for antitrust exemption legislation. The Senate Judiciary Committee's recommendation that an exemption conditioned on substantial elimination of the various intra-league restraints be granted was not acceptable to the defendants, and no legislation on the matter has been promulgated.

In August, 1973, Judge Tenney's earlier order was modified by allowing the two leagues to negotiate a merger or consolidation on the condition that any merger or consolidation agreement "deal specifically with and indicate the disposition of uniform player contracts, the common draft, and the reserve clause . . . .," and that the negotiations relating to those matters be conducted in the presence of plaintiffs' counsel or the general counsel of the National Basketball Players Association (Players Association). No agreement among the parties has yet been reached.

## II

### *The Immediate Controversy*

### A. *Plaintiffs' Claims*

#### 1. *Count One*

Count One of the complaint alleges that at least since its inception in 1946, the NBA has engaged in a concerted plan, combination or conspiracy to monopolize and restrain trade and commerce in major league professional basketball by: (1) controlling, regulating and dictating the terms upon which professional major league basketball is

---

3. In 1974, an amended complaint was filed which added additional plaintiffs and defendants who had joined in the litigation after the original complaint had been filed, and some of the named plaintiffs, e. g., Oscar Robertson, have now retired as active NBA players.

4. Defendant NBA is a joint venture which operates one of the two major professional basketball leagues in the United States. The NBA member clubs which operate in different home cities under franchise from the NBA are generally owned by corpora-

tions; those owners and officers or representatives of the management of the club owners are also named as defendants. The Board of Governors of the NBA, a formal group of the club owners which creates policy for and controls the affairs of the NBA, is also a defendant. For convenience' sake, all these defendants will be collectively known as NBA defendants.

5. Since there will be no references throughout to the original complaint but only to the amended complaint, the amended complaint will hereinafter be referred to as complaint.

played in the United States; (2) allocating and dividing the market of professional player talent; and (3) enforcing its monopoly and restraint of trade through boycotts, blacklists and concerted refusals to deal. NBA's purported objective is the elimination of all competition in the acquisition, allocation and employment of the services of professional basketball players—all *in* violation of Sections 1 and 2 of the Sherman Act.

The following practices are cited as among the means used by the NBA to effectuate and advance the underlying objectives of the conspiracy:

(1) *The College Draft* is allegedly designed to prevent competition among member NBA clubs for what is virtually the exclusive source of basketball talent in the country. The system operates so that each NBA club is given the exclusive right to choose specific college players with whom it desires to negotiate. If the college player does not wish to negotiate or play for the NBA club which "owns" his rights, the player may not negotiate with or for any other NBA club;

(2) *The Uniform Contract,* entitled the "National Basketball Association-Uniform Contract"[6] must be signed by every college player who agrees to play with one of the NBA clubs after he is "drafted," and by every veteran player each year. The contract provides that the player shall play basketball for his club or its assignees exclusively until "sold" or "traded"; that the club has the absolute right to sell, exchange, assign or transfer the Uniform Contract on the same terms to another club; and that if the player refuses to play, the club may either terminate the Uniform Contract or seek an injunction to pre-

vent the player from playing basketball for anyone else;

(3) *The Reserve Clause* is a part of the Uniform Contract which, if a player refuses to sign the Uniform Contract for the next playing season, empowers the club unilaterally to renew and extend the Uniform Contract for one year on the same terms and conditions including salary.[7] Any "traded" or "sold" player is bound to his new club by the reserve clause. Plaintiffs contend that the reserve clause gives the NBA clubs the express and unilateral right to keep renewing the Uniform Contract each year so long as the player refuses to execute the Uniform Contract, thus binding the player to one club for his entire playing career.

(4) *Boycotts, Blacklisting and Refusals to Deal* are allegedly utilized as well. Plaintiffs contend that no NBA club will negotiate with a player to play for another club who has signed or refused to sign the Uniform Contract, and is thus under "reserve". Nor will any NBA club negotiate for the services of a player who is voluntarily retired from another club, under suspension, in military service, disabled or injured. Any NBA club which contracts or negotiates with such a player is similarly boycotted, blacklisted or otherwise penalized;

(5) *The New League* is off-limits to NBA players. Plaintiffs assert that the NBA has used the practices summarized in (1) through (4) above to prevent the players not only from negotiating freely with member clubs of the NBA, but also from negotiating with or playing for clubs in any rival league.[8]

In sum, Count One sets forth the acts and practices of the NBA which are *purportedly designed* "to prevent in perpetuity any player from playing profes-

---

6. The complaint states that those few players who are not bound to sign the Uniform Contract, and hence are not bound by its terms, are nonetheless affected by the other anti-competitive practices imposed on all players by the defendants.

7. Prior to 1971, the contract could be unilaterally renewed with a 25% reduction in sala-

ry, but this provision was dropped by the NBA in 1971, and the renewal is at the same salary.

8. In 1967, the ABA was organized and began to compete with the NBA for both players and spectators.

sional basketball for anyone other than the NBA club to which the exclusive rights to his services have been granted by defendants for his lifetime."[9]

## 2. Count Two

The circumstances which give rise to Count One[10] also underlie Count Two. Plaintiffs contend that even if the reserve clause is not deemed to be a perpetual right of renewal, and instead is interpreted and enforced as a one-year option after the Uniform Contract term expires, nonetheless, the contract is still in violation of Sections 1 and 2 of the Sherman Act. The same combination and conspiracy alleged and described in Count One prevent any other NBA club from negotiating with or hiring a player during this one-year option period. After the expiration of the one-year period, the player who would try to negotiate with another NBA club, or the club which agreed to negotiate with the player, would be subjected to boycott, blacklisting, refusals to deal, or other penalties which the defendants allegedly impose to enforce their combination to monopolize and restrain trade.

This count additionally attacks what is designated "predatory" tactics waged by the NBA on the ABA. After the expiration of the one-year option provided under the Uniform Contract, the existence of a rival league is said to provide an "escape route" from the anti-competitive structure of the NBA since a player could attempt to negotiate with clubs of that league. Since 1967, however, the complaint states that the NBA has unlawfully combined or conspired to preserve its monopoly position and further its illegal restraints by employing certain devices to destroy the ABA. Those attempts have failed, according to the plaintiffs, and the rival league now flourishes to the decided and obvious financial advantage of present and future NBA players.[11]

This failure to destroy the ABA has allegedly led to a new combination or conspiracy by the NBA to suppress competition by an attempted merger or consolidation of the two leagues which will lead to the demise of the ABA as a competitive force. Among the means employed by the NBA, even prior to actual merger, is the enactment of a non-competition agreement between the leagues and their clubs, and secret negotiations with the ABA to effectuate the merger of the two leagues.

9. See paragraph 31 of the complaint.

10. The complaint alleges the following:

"37. As a result of the aforesaid unlawful combination or conspiracy, plaintiff players have been injured in their business and property, in that they have lost substantial amounts of income which, but for the unlawful acts of defendants, they would have earned from playing professional basketball. Moreover, since plaintiff players are not free to exploit their reputations in locations of their choice, they have been restrained and injured in the pursuit of collateral activities, such as product endorsements and publicity appearances. The amounts of such damages are not presently ascertainable; when ascertained, plaintiffs will ask leave of the Court to amend the complaint by inserting said amounts herein.

"38. Plaintiff players have also been injured, apart from financial considerations, as a result of the aforesaid combination or conspiracy, in that they cannot play in the NBA in locations of their choice or for clubs which may offer more favorable opportunities or conditions of employment.

"39. The aforesaid combination or conspiracy is continuing, and is causing irreparable injury to plaintiff players. Since any damages recoverable hereunder will only partially compensate them for all their injuries, plaintiff players have no complete and adequate remedy at law and the violations alleged herein should therefore be enjoined."

11. "As a result of the competition fostered by the continued independent existence of the ABA, which has provided the potential escape route for NBA players, certain NBA clubs have begun to increase the compensation of certain of the NBA players and prospective players above the artificially suppressed compensation levels in existence prior to the advent of competition from the ABA. The mere threat of taking this escape route by some NBA players has led to instant increases in their compensation." Paragraphs 44–45 of the complaint.

### 3. *Count Three*

Count Three joins the ABA as a defendant and is based on the aforesaid merger plans and non-competition agreement. Essentially it charges both the NBA and the ABA with violations of Sections 1 and 2 of the Sherman Act. Consummation of the merger, it is alleged, would eliminate all actual and potential competition between the defendants; and the effectuation of the non-competition agreement would have this effect prior to a formal merger. The unlawful practices described in Counts One and Two would continue either in the surviving league, or if no merger occurs, would remain in effect in the NBA.[12]

### 4. *The Remaining Counts*

Count Four embraces an asserted violation by the NBA defendants of New York's antitrust law.[13]

Count Five is similarly brought against the NBA for common law violations in each state in which it exhibits professional basketball games, and jurisdiction is asserted on both Counts Four and Five on pendent jurisdiction.

Plaintiffs seek declaratory and injunctive relief, against both intra- (reserve clause, player draft, compensation plan, boycotts and blacklisting) and inter- (merger or non-competition agreement) league restraints and treble damages, costs and attorneys' fees.

### B. *The Instant Motions*

Plaintiffs move for a class action determination which NBA opposes. NBA, on its part, moves for summary judgment, pursuant to Rule 56, F.R.Civ.P., in respect of Count One, part of Count Two, and Counts Four and Five. NBA has also moved, pursuant to Rules 12 and 19, F.R.Civ.P., to dismiss the complaint for failure to join an indispensable party. ABA moves for summary judgment in respect of Count Three and seeks dissolution of the preliminary injunction in effect since 1970. Both defendants claim jurisdiction is lacking since primary jurisdiction rests with the National Labor Relations Board.[14]

### III

### *Does Primary Jurisdiction Lie with the NLRB?* [15]

In Local 189, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO v. Jewel Tea Co., 381

---

12. Plaintiffs claim that negotiations between the leagues have already resulted in financial injury to players.

13. New York General Business Law, § 340:
"Contracts or agreements for monopoly or in restraint of trade illegal and void
"1. Every contract, agreement, arrangement or combination whereby
"A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby
"Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby
"For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void."

14. ABA originally filed a counterclaim against the plaintiffs, the Players Association, and Laurence Fleisher, counsel and collective bargaining agent for the Players Association. Following a hearing on September 3, 1974, ABA filed a new answer which deleted all claims against the plaintiffs, the Players Association and Fleisher.

15. NBA argues that if bargaining history were relevant, "determination of any factual disputes on that issue would have to be determined by the National Labor Relations Board in the first instance." NBA Memorandum at 30. ABA, on the other hand, states that even if the merger or non-competition agreement is "barred," plaintiffs still have a remedy outside the antitrust laws,
"for a complete remedy is available to them in unfair labor proceedings, to wit: a charge that the leagues have refused to bargain in good faith in violation of Section 8(a)(5)." ABA Memorandum at 24–25.

U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), review was limited to two questions. The first concerned labor exemption, which will be considered hereafter; the second was

> "[w]hether a claimed violation of the Sherman Antitrust Act which falls within the regulatory scope of the National Labor Relations Act is within the exclusive primary jurisdiction of the National Labor Relations Board." 381 U.S. at 684 n. 3, 85 S.Ct. at 1599.

Justice White, without dissent, rejected the primary jurisdiction contention and refused to stay the case to await a NLRB determination as to whether the uniform closing hours was a "term or condition of employment." The Court based its conclusion on three grounds. First, "courts are themselves not without experience in classifying bargaining subjects as terms or conditions of employment." Second, "the doctrine of primary jurisdiction is not a doctrine of futility." It does not require the expense and delay of an administrative proceeding when "the case must eventually be decided on a controlling legal issue wholly unrelated" to that which was referred for administrative determination. Third, there may be lacking an available procedure for obtaining a NLRB determination. The Board "does not classify bargaining subjects in the abstract but only in connection with unfair labor practice charges of refusal to bargain." 381 U.S. at 686–87, 85 S.Ct. at 1600.[16]

Additionally, the defendants' contentions are unsupported by the decisional law in this Circuit. This court in Intercontinental Container Transport Corp. v. New York Shipping Association, 312 F. Supp. 562 (S.D.N.Y.) (Mansfield, J.), rev'd on other grounds, 426 F.2d 884 (2d Cir. 1970), rejected the argument that jurisdiction was lacking since the plaintiff had raised the same issues as unfair labor practices before the NLRB. The court said:

> "We are faced not with potential conflict between state regulation and national labor policy, but with the intersecting provisions of two federal statutes. That certain activities may arguably constitute an unfair labor practice . . . does not oust a federal court of jurisdiction over a Sherman Act claim arising out of the same activities as part of a combination with employers to restrain competition against the latter, and this is true whether or not the Sherman Act plaintiff has invoked the jurisdiction of the Board over his unfair labor practice claims." 312 F.Supp. at 571.

The Second Circuit affirmed this holding, and, citing *Jewel Tea,* stated that an independent claim of preemption was erroneous. 426 F.2d at 887.

█ In any event, the antitrust issues involved here are not within the "special competence" of the NLRB, and therefore the doctrine of primary jurisdiction is inapplicable, *see* United States v. Western Pac. R.R., 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Denver Union Stockyard Co. v. Denver Livestock Commission Co., 404 F.2d 1055, 1059 (10th Cir. 1968), cert. denied, 394 U.S. 1014, 89 S.Ct. 1631, 23 L.Ed.2d 40 (1969); Fischer v. Kletz, 249 F.Supp. 539, 544 (S.D.N.Y.1966), and the factual disputes to be resolved concerning the history of collective bargaining between the players and the NBA are unquestionably proper subjects for determination by the court. *See* Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462, 481–86, 506–507 (E.D.Pa.1972) (hereafter *Philadelphia Hockey*); Boston Professional Hockey Association, Inc. v. Cheevers, 348 F.Supp. 261, 267–68 (D. Mass.), remanded, 472 F.2d 127 (1st Cir. 1972). The two cases relied upon

---

16. "Moreover, even in the few instances when the antitrust action could be framed as a refusal to bargain charge, there is no guarantee of Board action." 381 U.S. at 687, 85 S.Ct. at 1601. Defendants' contention that plaintiffs can raise their complaints as an unfair labor practice charge (NBA Reply Memorandum at 18; ABA Memorandum at 24–25) is without merit.

by defendants, International Association of Heat and Frost Insulators and Asbestos Workers v. United Contractors Association, Inc., 483 F.2d 384, 402–403 (3d Cir. 1973), and Carpenters District Council v. United Contractors Association of Ohio, Inc., 484 F.2d 119, 122–23 (6th Cir. 1973), are inapposite. They involved situations in which the Board, in contrast to the instant situation, had particular expertise. Accordingly, defendants' contentions are rejected.

## IV

### *The Motion to Dismiss*

NBA has moved under Rule 19, F.R. Civ.P.,[17] to dismiss the complaint because of failure to name the Players Association as a party. In the alternative, the NBA contends that the Players Association should be joined as a party in this action. I find that the Association is neither an indispensable party under Rule 19(b) nor one that ought to be joined pursuant to Rule 19(a).

The purpose of Rule 19(a) has been defined as a requirement "to bring before the court all persons whose joinder would be desirable for a just adjudication of the action . . . ." Wright & Miller, Federal Practice and Procedure: Civil § 1604, at 32 (1972). Rule 19(a) is applicable when (1) failure to join an absentee would prevent complete relief or (2) where an absentee "claims an interest relating to the subject of the action and is so situated" that its absence will impair its ability to protect that interest or will leave any of the parties subject to multiple or inconsistent obligations, and the risk of the latter is substantial. *See, e. g.,* Morgan Guaranty Trust Co. v. Martin, 466 F.2d 593, 598 & n. 6 (7th Cir. 1972); FTC v. Manager Retail Credit Co., 357 F.Supp. 347, 354 (D.D.C.1973); *but see* Window Glass Cutters League of America, AFL-CIO v. American St. Gobain Corp., 47 F.R.D. 255, 258 (W.D.Pa.1969), aff'd, 428 F.2d 353 (3d Cir. 1970).

The practical, and not the theoretical, controls. *See* Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 106–107, 110, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).[18] The As-

17. "(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action. Rule 19(a), F.R.Civ.P.

"(b) *Determination by Court Whenever Joinder not Feasible.* If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good con-

science the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." Rule 19(b), F.R.Civ.P.

18. While Rule 19(a) covers those persons who should be joined by court order, Rule 19(b) controls the determination of when a case should be dismissed due to the impossibility of joining a Rule 19(a) absentee. Even if my finding that the joinder of the Players Association is not desirable is in error, dismissal of the complaint will not result. There is no hint that the Association will not be amenable to joinder, or that such joinder would divest this court of jurisdiction. *See* Wright & Miller, Federal Practice and Procedure, Civil § 1604, at 35-36, 43.

sociation has claimed no interest relating to this action.[19] The possibility of harm to the Association, see Zwack v. Kraus Bros. & Co., 93 F.Supp. 963 (S.D.N.Y.1950), or the risk of multiple obligations has not been demonstrated. The mere fact that a decision in this case could conceivably affect the Association does not automatically require its joinder. See, e. g., Provident Tradesmens Bank, supra, 390 U.S. at 110, 88 S.Ct. 733; ACLU v. Board of Public Works, 357 F.Supp. 877, 884 (D.Md. 1972); Hoots v. Commonwealth of Pennsylvania, 359 F.Supp. 807, 822 (W.D.Pa.1973), appeal dismissed, 495 F.2d 1095 (3d Cir. 1974). If it later appears that joinder is desirable or necessary, it can then be effectuated. See Advisory Committee's Note to Rule 19, reprinted in 39 F.R.D. 89, 93 (1966); ACLU v. Board of Public Works, supra, 357 F. Supp. at 885.

Cases holding that a union which has negotiated a collective bargaining agreement with an employer is an indispensable party in a suit by an employee against the employer, are cited by the NBA to support its contention that joinder of the Association is required under Rule 19(b). It is conceded that a union should be joined when the suit will directly affect the union's interest in the operation of a bargaining agreement. See Lynch v. Sperry Rand Corp., 62 F.R.D. 78 (S.D.N.Y.1973); Neal v. System Board of Adjustment, 348 F.2d 722 (8th Cir. 1965); Hodgson v. School.Board, New Kensington-Arnold School District, 56 F.R.D. 393 (W.D.Pa.1972); Reyes v. Missouri-Kansas-Texas R.R., 53 F.R.D. 293 (D.Kan.1971); Morris v. Steele, 253 F.Supp. 769 (D.Mass.1966). Those cases, however, have no application here where it is yet uncertain that the restraints involve the operation of a collective bargaining agreement. The state-ment of Judge Bryan in Lynch, supra, 62 F.R.D. at 86, that "[h]aving negotiated with . . . [the employer] over the contents of the collective bargaining agreements, the absent unions clearly have an interest in litigation which seeks to rewrite portions of those agreements" is inapplicable.

Moreover, most of the cases relied upon by defendants concerned claims by employees whose interests conflicted with other groups of employees in the same bargaining unit, or with the union itself. Neal, supra; Lynch, supra; Hodgson, supra; Steele, supra; Reyes, supra; and English v. Seaboard Coastline Ry., 465 F.2d 43 (5th Cir. 1972). It is undisputed for purposes of the motion for summary judgment that all the members of the Association have a common interest in the success of this action.[20] Finally, determination of whether a party should or must be joined can only be arrived at in the context of the particular litigation; a flexible case by case approach must be employed consonant with what the equities and facts require. Provident Tradesmens Bank, supra, 390 U.S. at 118, 88 S.Ct. 733; Wright & Miller, supra, Civil § 1612, at 122.

■ There is no need to join the Players Association at this time, especially where the interest of the Association appears to be adequately represented by the plaintiffs. See Gilbert v. General Electric Co., 59 F.R.D. 273 (E.D. Va.1973). Accordingly, the motion to dismiss is denied.

### V

### *The Motion to Dissolve the Preliminary Injunction*

■■ ABA seeks dissolution of the preliminary injunction to prevent the merger or agreement of non-competition

---

19. NBA defendants claim that the Association is "vitally interested" in this action. Assuming arguendo that that is true, and satisfies Rule 19(a)(2), NBA gives no reason why the continuation of this action in the Association's absence will impair the lat-ter's interest or leave the defendants subject to multiple or inconsistent obligations.

20. NBA contends differently for purposes of its opposition to plaintiffs' class action determination. See NBA Class Action Memorandum at 12–21.

between the two leagues. That injunction was issued more than four years ago. The argument, that Section 1 of the Norris-LaGuardia Act, 29 U.S.C. § 101, mandates its dissolution is patently meritless. The Norris-LaGuardia Act does not apply in an antitrust case, even one which arguably involves a labor dispute. Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); Los Angeles Meat & Provision Drivers Union v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962); *International Container Transport Corp., supra;* Anderson-Friberg, Inc. v. Justin R. Clary & Son, 98 F.Supp. 75 (S.D.N.Y.1951). The contention that the injunction consented to by the ABA when issued initially in 1970 and in continuous effect since, should be lifted now is obviously makeweight; made, apparently, in the hope that the court might be caught nodding and in a state of somnambulism sign the order lifting the ban. The motion is denied.

## VI

### *The Motions for Summary Judgment*

#### A. *The State Law Counts*

█ NBA argues that summary judgment should be entered in its favor in respect of Counts Four and Five because the interstate nature of professional basketball precludes state antitrust regulation. I agree.

In Flood v. Kuhn, 316 F.Supp. 271 (S.D.N.Y.1970), aff'd, 443 F.2d 264 (2d Cir. 1971), aff'd, 407 U.S. 258, 92 S.Ct.

2099, 32 L.Ed.2d 728 (1972), the petitioner raised state statutory and common law challenges to baseball's reserve system, which encompassed many of the practices in dispute in this litigation.[21]

Judge Cooper denied both state claims on the ground that baseball's unique exemption from federal antitrust law, *see* Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), compelled similar exemption from state antitrust regulation. 316 F. Supp. at 279–80; *see* State v. Milwaukee Braves, Inc., 31 Wis.2d 699, 144 N.W.2d 1, 16–18, cert. denied, 385 U.S. 990, 87 S.Ct. 598, 17 L.Ed.2d 451 (1966). The Court of Appeals affirmed, but on the ground that state antitrust regulation would be an impermissible burden on interstate commerce. 443 F.2d at 268. The United States Supreme Court held that "[a]s applied to organized baseball . . . [the statements of the District Court and the Court of Appeals] adequately dispose of the state law claims." 407 U.S. at 284–85, 92 S.Ct. at 2113.

Though somewhat ambiguous, I read the statement in Justice Blackmun's opinion as approving both bases for the lower courts' rejection of Flood's state law claims. Judge Cooper's decision would not be controlling here, since professional basketball is subject to federal antitrust regulation. *See* Haywood v. National Basketball Association, 401 U.S. 1204, 1205, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971), and as a result no danger exists of diversity of treatment if state law were also to apply. But the opinion of the Court of Appeals is unquestionably applicable and controlling.[22]

---

21. The reserve system in baseball included the reserve clause itself, the player draft, and the right to assign a player's contract to another club. 316 F.Supp. at 273–74.

22. There, Judge Waterman said:

"It appears to be without question that, today, professional baseball, with its complex web of franchises, farm teams and recruiters, and its multi-million dollar contracts with television and radio networks, is interstate commerce. Our difficulty lies in determining to what extent, if at all, the states

are precluded from antitrust regulation of interstate commerce. *See* Note, The Commerce Clause and State Antitrust Regulation, 61 Colum.L.Rev. 1469 (1961). The Supreme Court has not, to our knowledge, expressed any opinion as to the outer limits of state antitrust policy, although it has clearly held that state antitrust policy is not ousted from the regulation of local matters which may also be affected by federal laws. [citations omitted]. Therefore, we turn for guidance to cases involving other areas of state regulation.

When *Flood* was decided, baseball had 24 teams operating in 24 "home" cities with the teams divided into two leagues. NBA has 18 teams operating in 18 "home" cities, and those teams are divided into two conferences. Baseball and basketball are in the same business, which is the staging of sports contests for public view, and there is no dispute that "professional basketball involves substantial volumes of interstate trade and commerce." Complaint at ¶ 17. The motion for summary judgment in respect of Counts Four and Five is granted.

## B. *The Labor Issues*

Taken together, the ABA and NBA motions for summary judgment effectively challenge plaintiffs' claims in their entirety. Both defendant Associations assert that plaintiffs are precluded from seeking through antitrust litigation the right to negotiate freely with any team of their choice and a bar to any merger or combination between the two leagues.

The two leagues claim that the complaint has tried to cast in antitrust terms a series of demands and issues which naturally and lawfully belong on the bargaining table. The intent of the suit is to increase plaintiffs' individual bargaining power. This, it is argued, conflicts with the policy announced in the National Labor Relations Act, 29 U. S.C. § 151.[23] The defendants' more fundamental contention, however, is that

---

"[W]here the nature of an enterprise is such that differing state regulation, although not conflicting, requires the enterprise to comply with the strictest standard of several states in order to continue an interstate business extending over many states, the extra-territorial effect which the application of a particular state law would exact constitutes, absent a strong state interest, an impermissible burden on interstate commerce. Southern Pacific Co. v. Arizona, 325 U.S. 761, 774–775, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

"Professional baseball clubs, although existing as separate legal entities, are organized into so-called leagues for competitive play and are dependent on the league playing schedule to further the ends of their sports competition. Therefore, it is the league structure at which any state antitrust regulation must be aimed if organized professional baseball is not to be severely fragmented. On the one hand, it is apparent that each league extends over many states, and that, if state regulation were permissible, the internal structure of the leagues would require compliance with the strictest state antitrust standard. The consequent extra-territorial effect of necessary compliance would be considerably more far-reaching than that in Southern Pacific Co. v. Arizona, *supra*. On the other hand, we do not find that a state's interest in antitrust regulation, when compared with its interest in health and safety regulation, is of particular urgency. Hence, as the burden on interstate commerce outweighs *the states' interests in regulating* baseball's reserve system, the Commerce Clause precludes the application here of

state antitrust law." 443 F.2d at 267–68 (footnote omitted).

23. "§ 151. Findings and declaration of policy

"The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

"The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

"Experience has proved that protection by law of the right of employees to organ-

they are protected against the impact of the antitrust laws by a labor exemption.

### 1. *Plaintiffs' Standing to Sue Under the Antitrust Laws*

■ It is undoubtedly true that the intent of Congress was and is to encourage collective bargaining as the means of settling labor disputes. *See, e. g.,* Section 2 of the Norris-LaGuardia Act, 29 U.S.C. 102; the National Labor Relations Act, 29 U.S.C. § 151; Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 211, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Surely, this policy constitutes a federal commitment to a bargaining system which "of necessity subordinates the interests of an individual employee to the collective interests of all employees," Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967); *see also* NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). In fact, Section 9(a) of the National Labor Relations Act provides that the representative of the bargaining unit shall be the exclusive agent for bargaining relating to wages, hours and other conditions of employment. 29 U.S.C. § 159(a); *see generally* NLRB v. Allis-Chalmers, *supra;* J. I. Case v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944); Western Addition Community Organization v. NLRB, 158 U.S. App.D.C. 138, 485 F.2d 917, 924 (1973).

Section 4 of the Clayton Act, 15 U.S.C. § 15, grants standing for antitrust suits to any "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." Courts have consistently allowed plaintiffs to sue their employers for alleged antitrust violations of the nature here asserted. In Anderson v. Shipowners' Association, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926), a seaman sued for himself and for all other members of the Seaman's Union against the Association, challenging the use of an employment registry.[24] The Supreme Court reversed a dismissal of the complaint, sustaining, *inter alia,* the right of the plaintiff to assert his claim.

---

ize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

"Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed.

"It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

24. The registry had been established unilaterally by the Association, and functioned as a means of allocating seamen among the shipowners. In effect, it served as a hiring hall. The precedential strength of the holding in *Anderson* which found the registry to be in violation of the antitrust laws, considering the subsequent cases which have generally upheld the use of the hiring hall, *see* Local 357, International Brotherhood of Teamsters v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); NLRB v. Tom Joyce Floors, Inc., 353 F.2d 768 (9th Cir. 1965); NLRB v. Houston Chapter, Associated General Contractors of America, Inc., 349 F.2d 449 (5th Cir. 1965), cert. denied, 382 U.S. 1026, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), has been substantially eroded. However, this development has not affected that part of *Anderson's* holding allowing suit by employees against employers for violations of the antitrust laws.

That Anderson was a union member, or that a bargaining agreement may or may not have been in effect, did not appear to be determinative.

In Nichols v. Spencer International Press, Inc., 371 F.2d 332 (7th Cir. 1967), an ex-encyclopedia salesman sued his former employer and another publisher who had refused to hire him. The action attacked on antitrust grounds a "no-switching" agreement whereby each defendant promised not to hire any former employees of the other for six months after termination of the former employment. The court reversed the grant of summary judgment and the entry of an order with respect to antitrust issues in favor of defendants, relying in part on a Second Circuit decision which ten years earlier had declared a similar agreement to constitute an unreasonable restraint of trade.[25] The Seventh Circuit said:

> "one who has been damaged by loss of employment as a result of a violation of the antitrust laws is 'injured in his business or property' and thus entitled to recovery under 15 U.S.C.A. § 15. . . . [T]he interest invaded by a wrongful act resulting in loss of employment is so closely akin to the interest invaded by impairment of one's business as to be indistinguishable in this context." 371 F.2d at 334.

More recently this court (Mansfield, J.) in Cordova v. Bache & Co., 321 F. Supp. 600 (S.D.N.Y.1970), dealt with the issue. There, the president of the American Association of Securities Representatives sued various brokerage firms which had unilaterally agreed to reduce the commissions paid to securities representatives. It was claimed that the agreement would have the effect of eliminating wage competition by

the establishment of an inviolate "going rate."[26] Judge Mansfield ruled that neither the president nor the Association itself had standing to bring the claim; the president lacked standing because he was not an employee of any of the defendant firms and the Association lacked standing because it could not, under the antitrust laws, assert the rights of its members. The court permitted the substitution of several employees as plaintiffs, and the standing requirements were met.

In the sports area, the standing of players to assert antitrust violations similar to those alleged here has generally not been questioned. In the *Philadelphia Hockey* case, Judge Higginbotham specifically held that players threatened with injury through the enforcement of the reserve clause could sue their employers:

> "Conduct by the NHL which tends to eliminate competition between actual and/or potential competitors is actionable by players who have been or who are likely to be injured thereby." 351 F.Supp. at 518.

Standing has been found to exist for hockey players challenging the reserve system, *Boston Professional Hockey Association, supra*; for a basketball player challenging the college draft system, Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C.D.Cal.1971); for a golfer challenging a group boycott, Blalock v. Ladies Professional Golf Association, 359 F.Supp. 1260 (N.D.Ga. 1973); for a football player challenging (a) blacklisting following a violation of the reserve clause, Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), and (b) the reserve clause and other intra-league re-

25. "One probable result of the agreements, because entered into by organizations that represent a very substantial segment of the industry, will be to 'freeze' the labor supply, which is the indispensable element of the door-to-door magazine-selling trade." Union Circulation Co. v. FTC, 241 F.2d 652, 658 (2d Cir. 1957).

26. "The effect of such a unilateral agreement between employers, as alleged in the present complaint . . . could also be to restrain mobility on the part of employees who would otherwise have the opportunity, in a competitive market for services, to transfer to higher paid opportunities offered by others." 321 F.Supp. at 606.

straints, Kapp v. National Football League, 390 F.Supp. 73 (N.D.Cal.1974).

Cases cited by the ABA are inapposite. Union members here are not trying to negotiate their own contracts while a collective bargaining agreement is in force, NLRB v. Allis-Chalmers, *supra*, 388 U.S. at 180, 87 S.Ct. 2001; NLRB v. U. S. Sonics Corp., 312 F.2d 610, 615 (1st Cir. 1963); nor are plaintiffs negotiating as a splinter group, Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). This litigation does not present a situation where only the "superstars" will benefit, Jacobs and Winter, Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L.J. 1, 7–10 (1971); *Philadelphia Hockey*, 351 F.Supp. at 515; and an individual union member is not here suing his union or employer for a breach of a collective bargaining agreement, Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

■ Similarly, the NBA's attempt to distinguish a line of cases generally supportive of plaintiffs' right to sue on antitrust grounds is unpersuasive. These authorities are characterized by NBA as cases where "strangers" to a collective bargaining process have sued[27] or, alternatively, cases where employees have been allowed to sue due to the absence of a collective bargaining relationship.[28] But cases in the first category never involved suits by employees; they all were brought by employers. And in the latter group courts made no mention of the lack of bargaining as decisive or even significant in their decisions allowing employees to sue. Plaintiffs have standing to bring this suit.

### 2. *Labor Exemption from Antitrust Laws*

■ There is no operative labor exemption barring or protecting the defendants from being sued for antitrust violations. The statutory bases for labor's exemption from the application of the antitrust laws are found in Sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52.[29] A simple and con-

---

27. *E. g.*, Ramsey v. United Mine Workers of America, 401 U.S. 302, 91 S.Ct. 658, 28 L. Ed.2d 64 (1971); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S. Ct. 1585, 14 L.Ed.2d 626 (1965); Intercontinental Container Transport Corp. v. New York Shipping Association, 426 F.2d 884 (2d Cir. 1970).

28. Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Union Circulation Co. v. FTC, 241 F.2d 652 (2d Cir. 1957); Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C.D.Cal.1971); Cordova v. Bache & Co., 321 F.Supp. 600 (S.D.N.Y.1970).

29. The Clayton Act provides:
§ 6 "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or con-

strued to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."
§ 20 "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such per-

cise answer to defendants' contention is that the exemption extends only to labor or union activities, and not to the activities of employers.

In *Allen Bradley, supra,* the Court reviewed the history of federal labor laws and antitrust legislation and held that the purpose behind the passage of the Clayton Act was to clarify the then-existing confusion regarding the vulnerability of labor unions to the prohibitions of the Sherman Act. It found that the Clayton Act had a twofold purpose: to make clear that (1) certain trade practices among *businessmen* were illegal; and that (2) the same or similar practices among or by *labor unions* were lawful.[30] The Court stated that Congress had intended by enactment of the Clayton Act to reverse earlier decisions applying antitrust principles to concerted union activities; the exemption was enacted to protect union activity against the wrongful application of the Sherman Act, 325 U.S. at 803–804, 65 S.Ct. 1533, and that judicial reluctance to apply the Clayton Act by its own terms, *see, e. g.,* Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), had led to the passage of the Norris-LaGuardia Act, 29 U.S.C. § 101, which

"protect[ed] the *rights of employees* to organize into unions and engage in

'concerted activities for the purpose of collective bargaining or other mutual aid or protection.'" 325 U.S. at 805, 65 S.Ct. at 1538 (Emphasis added).

Earlier, in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the Court had declared that all three acts—Sherman, Clayton and Norris-LaGuardia—must be read in conjunction with each other to determine whether concerted activities of unions are prohibited under the antitrust laws. Discussing the labor exemption, it had held that:

"So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." 312 U.S. at 232, 61 S.Ct. at 466 (footnote omitted).

The Court concluded in *Allen Bradley,* as a result of its review of the statutory and decisional law, that unions would lose their exemptions once they aided "non-labor groups to create business monopolies and to control the marketing of goods and services." 325 U.S. at 808, 65 S.Ct. at 1539.[31]

---

son or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any laws of the United States."

30. "[T]here is no record indication in anything that was said or done in its passage which indicates that those engaged in busi-

ness could escape its or the Sherman Act's prohibitions by obtaining the help of labor unions . . . ." As to unions, "the Clayton Act pointed in an opposite direction." 325 U.S. at 803, 65 S.Ct. 1537.

31. "So far as the union might have achieved this result acting alone, it would have been the natural consequence of *labor union activities exempted by the Clayton Act* from coverage of the Sherman Act. [citations omitted]. But when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts.

"It must be remembered that the *exemptions granted the unions were special exemptions* to a general legislative plan. The primary objective of all the Anti-trust legislation has been to preserve business compe-

■ *Allen Bradley* made clear that the "labor exemption" was created for the benefit of unions. While later cases revealed the possibility of a circumscribed exemption for employers, which might arise derivatively, and become effective when employers are sued by third parties for the activities of unions, the protection of the exemption is afforded only to employers who have acted jointly with the labor organization in connection with or in preparation for collective bargaining negotiations. *See, e. g.,* Cordova v. Bache & Co., *supra,* 321 F.Supp. at 607.

Judge Higgenbotham, in the *Philadelphia Hockey* case, in rejecting the NHL's attempt to employ the exemption, stated:

"The labor exemption which could be defensively utilized by the union and employer as a shield against Sherman Act proceedings when there was bona fide collective bargaining, could not be seized upon by either party and destructively wielded as a sword by engaging in monopolistic or other anti-competitive conduct. The shield cannot be transmuted into a sword and still permit the beneficiary to invoke the narrowly carved out labor exemption from the antitrust laws." 351 F. Supp. at 499–500.

In the *Cordova* case, Judge Mansfield refused to dismiss the securities representatives' antitrust suit on the ground that the labor exemption protected the employers:[32]

"[T]he sole purpose and effect of the section is to exempt activities and agreements on the part of labor . . . organizations with respect to their furnishing labor in the market place.

. . . . . .

"It is readily apparent that Congress . . . was concerned with the right of labor and similar organizations to continue engaging in such activities, including the right to strike, not with the right of employers to band together for joint action in fixing the wages to be paid by each employer." 321 F.Supp. at 605, 606.[33]

Nonetheless, defendants rely on a twofold "test" which purports to determine when the exemption is available to employers. They argue that the appropriate test is as follows:

"The test for applicability of the labor exemption which emerges from *Jewel Tea* and *Pennington,* is twofold: 1) Are the challenged practices directed against non-parties to the relationship; if they are not, then 2) are they mandatory subjects of collective bargaining? If the answer to No. 1 is no, and to No. 2 yes, the practices are immune. . . ." NBA Memorandum at 28.

---

tition and to proscribe business monopoly. It would be a surprising thing if Congress, *in order to prevent a misapplication of that legislation to labor unions,* had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective.

. . . . .

"Our holding means that the same *labor union* activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups. This, it is argued, brings about a wholly undesirable result—one which leaves labor unions free to engage in conduct which restrains trade. But *the desirability of such an exemption of labor unions* is a question for the determination of Congress." *Id.* 325 U.S. at 809–10, 65 S.Ct. at 1540 (emphasis added).

32. The argument was raised by defendants there, as here, that economic history since the enactment of the Clayton Act compels an interpretation of the exemption which is not one-sided. I adopt that court's response, which was that if the exemption is to be applicable to both employers and labor organizations, Congress must make this purpose clear through amendment of the Clayton Act. 321 F.Supp. at 607.

33. *See* Volkswagenwerk v. FMC, 390 U.S. 261, 287 n. 5, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968) (concurring opinion); NLRB v. Truck Drivers Local 449, 353 U.S. 87, 77 S. Ct. 643, 1 L.Ed.2d 676 (1957); Kennedy v. LIRR, 319 F.2d 366, 371 n. 4 (2d Cir.), cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963); Clune v. Publishers Association of New York City, 214 F.Supp. 520, 524 (S.D.N.Y.), aff'd, 314 F.2d 343 (2d Cir. 1963).

Support for this "test" is allegedly found in United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Jewel Tea, supra,* which presented the Court with the opportunity to re-examine its holdings in *Hutcheson* and *Allen Bradley, supra.*

In *Pennington,* a small coal company cross-claimed against the UMW, challenging on antitrust grounds the terms of a multi-employer collective bargaining agreement between the union and other, larger, coal operators. The Court, relying on *Allen Bradley,* found that the union had lost its exemption when it combined with non-labor groups to eliminate competition from the market. Justice White stated, at 665–66, 85 S.Ct. at 1591, that:

> "[W]e think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. *One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy* (emphasis added).

There is no statement or suggestion in *Pennington* that an *employer* has an exemption from an antitrust suit by its employees, or by any other party. It was assumed that the large coal operators would have been liable regardless of the union's liability.

In *Jewel Tea,* several unions had entered into identical collective bargaining agreements with all retail employers in the meat industry; the clause in dispute

provided for uniform closing hours in all the meat departments. One employer attacked that clause arguing that he had only signed the agreement under threat of strike. As in *Pennington,* the fundamental question was whether the antitrust laws applied to the unions: could the agreement, obtained by the unions for their own benefit, be attacked, or was it exempt? No mention was made of labor exemption for employers. This issue, as framed by Justice White, was:

> "whether the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the *unions' successful attempt* to obtain that provision through bona fide, arm's-length bargaining in pursuit *of their own labor union policies, and not at the behest of* or in combination with *non-labor groups,* falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." 381 U.S. at 689–90, 85 S.Ct. at 1602 (emphasis added).

The exemption was held applicable.

Justice Goldberg, joined by Justices Harlan and Stewart, took a broader view, and it can be argued that his language does support to a limited degree the second half of the test proffered by defendants. According to Justice Goldberg, the balancing of labor and antitrust policies, as advocated by Justice White, was unnecessary,[34] for "collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act is not subject to the antitrust laws." 381 U.S. at 710, 85 S.Ct. at 1614.[35]

---

34. 381 U.S. at 689, 85 S.Ct. 1596. Justice White also declared that the fact that "[e]mployers and unions are required to bargain about wages, hours and working conditions . . . weighs heavily in favor of antitrust exemption for agreements on these subjects." *Ibid.*

35. "This rule flows directly from the *Hutcheson* holding that a union acting as a union, in the interests of its members, and not acting to fix prices or allocate markets in aid of an employer conspiracy to accomplish these objects, with only indirect union benefits, is not subject to challenge under the antitrust laws. To hold that mandatory collective bargaining is completely protected would effectuate the congressional policies of encouraging free collective bargaining, subject only to specific restrictions contained in the labor laws, and of limiting judicial intervention in labor matters via the antitrust route—an intervention which necessarily under the Sherman Act places on judges and

Whatever support may be found in the *Jewel Tea* concurring opinion for defendants' test is completely undermined by the Court's explicit statement in *Pennington* that:

> "[t]his is not to say that an agreement resulting from union-employer negotiations is automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining, regardless of the subject or the form and content of the agreement. . . .
> [T]here are limits to what a union or an employer may offer or extract in the name of wages, and *because they must bargain does not mean that the agreement reached may disregard other laws.*" 381 U.S. at 664–65, 85 S.Ct. at 1590 (emphasis added).

*See Philadelphia Hockey, supra,* 351 F. Supp. at 518. "Mandatory subjects of collective bargaining" do not carry talismanic immunity from the antitrust laws. Moreover, nothing that Justice Goldberg said actually supports any part of the "test" defendants propose.[36]

Nor does the "test" which supposedly "flows" from *Pennington* and *Jewel Tea* find support in later decisions. In this respect, defendants' principal reliance on Carroll v. American Federation of Musicians of the United States and Canada, 372 F.2d 155 (2d Cir. 1967), aff'd in part and rev'd in part, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), is misplaced. In *Carroll,* union-expelled orchestra leaders alleged that certain union regulations, particularly that establishing price floors, were violative of the antitrust laws. The Second Circuit held that the price floor regulation was a *per se* violation of Sections 1 and 2 of the Sherman Act. The Supreme Court reversed, holding that the union's labor exemption from the Act extended to the price floor regulation. Neither court, however, based its decision on defendants' proposed twofold "test".

The Second Circuit's first inquiry was whether there was, as in *Pennington,* a conspiracy between the union and the orchestra leaders to eliminate competition, fix prices or further any other commercial restraint. As the regulations were unilaterally imposed by the union, and merely acquiesced in by the leaders, it was held that no conspiracy existed to preclude exemption.[37] The court concluded that the price floor regulation was "not a subject of such direct and overriding interest to the unions . . . that it is a mandatory subject of collective bargaining." 372 F.2d at 165.[38] In reversing, the Supreme Court stated that the basic question was "whether the price floors in actuality operate to protect the wages of [other union members]." 391 U.S. at 108, 88 S.Ct. at 1568. Finding that the floors were intimately related to wages, the Court ruled that the regulations came within the exemption.

---

juries the determination of 'what public policy in regard to the industrial struggle demands.'" *Ibid.*

**36.** First, he reaffirmed the principle that the exemption arose for the benefit of labor, 381 U.S. at 700–11, 85 S.Ct. 1585; nothing was said which indicated that employers could enjoy that exemption save derivatively through negotiations with unions over mandatory subjects of bargaining. *Id.* at 711–12, 85 S.Ct. 1585. Second, Justice Goldberg limited those subjects as to which bargaining is compulsory to lawful ones; violations of the antitrust laws, *see* discussion, *infra,* would not come within the ambit of mandatory bargaining:

"The direct and overriding interest of *unions* in such subjects as wages, hours, and other working conditions, which Congress has recognized in making them subjects of mandatory bargaining, is clearly *lacking where the subject of the agreement is price-fixing and market allocation.* Moreover, such activities are at the core of the type of anticompetitive commercial restraint at which the antitrust laws are directed." *Id.* at 732–33, 85 S.Ct. at 1626 (emphasis added).

**37.** The Court of Appeals and the District Court also decided that the orchestra leaders were not a "non-labor" group within the meaning of *Allen Bradley* and *Pennington.*

**38.** The court also cited Justice Goldberg's statement in *Jewel Tea* that mandatory subjects do not include price-fixing and market allocation agreements. 372 F.2d at 164.

The more recent Second Circuit decision in *Intercontinental Container Transport Corp., supra,* clearly sets out what I think is the guiding test which emerges from the decisional law in the labor exemption area. In *Intercontinental,* plaintiff was a warehouse company which attacked a General Cargo Agreement entered into by the Longshoremen's Union and the Shipping Association. The agreement provided that, in return for a shift to containerization, the Association would enter into certain work preservation practices, in effect preventing plaintiff and others from competing with the Association. The Court of Appeals reversed a preliminary injunction issued in favor of the plaintiff, holding that the agreement was protected by the exemption pursuant to the following yardstick:

> "The test of whether labor union action is or is not within the prohibitions of the Sherman Act is (1) whether the action is in the union's self-interest in an area which is a proper subject of union concern and (2) whether the union is acting in combination with a group of employers." 426 F.2d at 887.

Judge Hays found that the containerization agreement was well within the union's self-interest:

> "The provisions of the collective agreement have as their object the preservation of work traditionally performed by longshoremen covered by the agreement." *Ibid.*

After finding that the provisions were within the area of proper union concern, Judge Hays turned to the second part of the Second Circuit test and found that "far from aiding and abetting a violation of the Sherman Act by a group of

business men, the union here, acting solely in its own self-interest, forced reluctant employers to yield to certain of its demands." *Id.* at 888.

The application of defendants' proposed "test" would result in an anomaly. The first question—whether the practices are addressed to third parties to the relationship—would be answered "yes". The second question—whether it was a mandatory subject of collective bargaining—is an irrelevance and was never asked. The basic inquiry must focus on determining whether the controverted practices or regulations were in the union's own interest. The test proposed by NBA has no validity.

### Mandatory Subjects of Collective Bargaining

The practices here under attack are not mandatory subjects of bargaining.[39] Reliance is placed on Judge Cooper's statement in *Flood, supra,* 316 F.Supp. at 283, that "[b]oth management and the Players' Association recognize the reserve system to be a mandatory subject of collective bargaining." However, Judge Cooper doubted that the reserve clause was a mandatory subject of collective bargaining, *Id.* at 278,[40] and neither the Second Circuit nor the Supreme Court found it necessary to pass on this issue. 443 F.2d at 268; 407 U.S. at 285, 92 S.Ct. 2099.

The other decisions cited by defendants are also inapplicable. The statement in NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S. Ct. 718, 2 L.Ed.2d 823 (1958), that a clause which regulates relations between employer and employee comes within the scope of Section 8(d) of the National Labor Relations Act is not a yardstick

---

39. Section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) requires "the employer and the representative of the employees to . . . confer in good faith with respect to wages, hours, and other terms and conditions of employment." Those items are mandatory subjects of bargaining; a party who refuses to negotiate regarding these matters commits an "unfair labor practice." *See* NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

40. In an earlier opinion denying a preliminary injunction for the plaintiff, Judge Cooper also stated that the reserve clause was not part of the collective bargaining agreement. Flood v. Kuhn, 309 F.Supp. 793, 806 n. 51 (S.D.N.Y.1970).

to determine whether a provision is a mandatory subject of bargaining. The Court in *Borg-Warner* was merely comparing the clause in dispute with one admittedly within the contours of Section 8(d). Moreover, the provision involved was held to be "lawful," *Id.* at 349, 78 S.Ct. 718, while here the issue of "lawfulness" spawns the controversy. Similarly, Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed. 2d 341 (1971), did not hold that a practice or provision which vitally affects the terms and conditions of employment is necessarily a mandatory subject of bargaining. There, the bargaining unit for current employees sought to negotiate certain insurance benefits for retired workers. The Court simply held that former employees' benefits are not "terms and conditions" of present workers' employment.

Two other cases involving third parties are likewise inapposite. Local 24, Teamsters Union v. Oliver, 358 U.S. 283, 293–95, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), concerned an agreement which established a minimum rental that carriers had to pay to truck owners who drove in place of union employees; it was held that the objective of the rental agreement was to protect the negotiated wage scale from evasion by payments to the owner-drivers of rentals which did not cover operating costs. *Fibreboard, supra,* held only that "contracting out" —the replacement of employees in the bargaining unit with those of an independent contractor—was a mandatory subject of bargaining.

Defendants argue that "contracting out" is somewhat analogous to some of the practices challenged here because

"contracting out" also determines which employer will hire employees for a particular job. However, *Fibreboard* warned that its conclusions did "not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex society." 379 U.S. at 215, 85 S.Ct. at 405. "Terms and conditions of employment" was not meant to reach every issue that might interest unions or employers. *See, e. g., Fibreboard, supra, Id.* at 220–21, 223–24, 85 S.Ct. 398, (Stewart, J., concurring); Westinghouse Electric Corp. v. NLRB, 387 F.2d 542, 545–48. (4th Cir. 1967).

■ I conclude at least tentatively since the record is not yet complete, that the reserve clause, the player draft, and the merger or non-competition agreement are not mandatory subjects of collective bargaining.[41] Defendants' argument that the above cited cases and others [42] require a contrary holding is wholly unpersuasive.

### C. Determination of The Validity of the Inter- and Intra-League Restraints on Motions for Summary Judgment

There apparently is no genuine issue regarding the existence of the challenged NBA practices; aside from the compensation plan, they are set out and regulated by various documents annexed as exhibits, including the NBA Constitution and By-Laws, and the Uniform Contract. Nor is there any dispute over the fact of the contemplated merger or agreement of non-competition.

On the basis of the documentary evidence submitted in support of the NBA motion for summary judgment, practically all of the intra- and inter-league

---

41. Even if the challenged practices were determined to be mandatory subjects, a court might nonetheless hold that they are not exempt. *See Pennington, supra,* n. 27, 381 U.S. at 664–65, 85 S.Ct. 1585; Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462, 498 (E. D.Pa.1972).

42. NLRB v. Houston Chapter, Associated General Contractors of America, Inc., 349

F.2d 449 (5th Cir. 1965), cert. denied, 382 U.S. 1026, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966) (hiring hall); United States Pipe and Foundry Co. v. NLRB, 298 F.2d 873 (5th Cir. 1962) (common expiration date for union contracts); Inland Steel Co. v. NLRB, 170 F.2d 247 (7th Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949) (retirement and pension plans).

restraints appear to be *per se* violative of the Sherman Act. When a player signs the present Uniform Contract, he agrees to play ball "only for the Club and its assignees" (Uniform Contract ¶ 5), the club is given the right to assign the contract (*Id.* ¶ 10), and the player agrees to report to his new club within a specified period of time (*Id.* ¶ 12). In addition, the reserve or option clause (*Id.* ¶ 22) binds the player to negotiate and deal only with the club which contracted with the player. After the contract's termination, the club may unilaterally renew the player's obligation to play for that team for an additional year.

Plaintiffs claim that the NBA's reserve clause grants each club a perpetual right of renewal. NBA defendants, on the other hand, assert that as the clause is presently interpreted, a player becomes a "free agent" once his club has exercised its option. After the player plays for the club for the one-year period, and assuming he does not sign a new contract, he becomes a free agent. Defendants' Memorandum at 9. This interpretation, however, must be read in the light of the adoption by the defendants of a compensation plan similar in purpose and effect, presumably, to the "Rozelle Rule," recently struck down as a violation of the Sherman Act in Kapp v. National Football League, *supra. See generally* Contractual Rights and Duties of the Professional Athlete—Playing the Game in a Bidding War, 77 Dickinson L.Rev. 352, 353, 387–93 (1973) (hereafter Playing the Game in a Bidding War).

The free agent can sign with another team, but it then "becomes the obligation of the player's new team to compensate his old team for loss of the player." Affidavit of J. Walter Kennedy, Commissioner of the NBA, ¶ 16 (hereafter Kennedy Affidavit). The Rozelle Rule contemplates that compensation include awarding to the past club one or more players of the acquiring club; even future draft choices are vulnerable in the compensation scheme.[43] The effect of the compensation system resulted in few NFL players playing out their options,[44] and the system was expressly condemned by the Senate Judiciary Committee in its report on the proposed NBA–ABA merger.[45]

The record does not reveal either the language or operation of the compensation plan, it not being set out in the NBA Constitution, By-Laws or Uniform Contract. Defendants expressly state that the NBA plan is dissimilar in some respects from the Rozelle Rule. Kennedy Affidavit ¶ 17. It is uncertain whether a perpetual reserve was ever employed by the NBA, and, if it was, when it was superseded by the one-year reserve-compensation system.

The NBA's annual "college draft" allocates the rights to negotiate with eligible college players among the teams; those with the worst won-lost records choose first. A NBA club which has drafted a college player holds the exclu-

43. Dave Parks was an all-pro receiver for the San Francisco 49ers who played out his option and signed with the New Orleans Saints. Pete Rozelle ordered the Saints to surrender their 1968 and 1969 first round draft choices as compensation. One commentator has said of this ruling:

"First-round draft choices are extremely valuable and this price exacted by the commissioner is an indication that signing a supposedly free agent who has played out his option may cost the [new] team more than the player is worth. Thus a player who has played out his option must now convince a new team that he is worth not only the salary he is seeking but also the loss of any player on the new team which the commissioner, in his total and unappealable discretion, considers to be adequate compensation to the old team." Playing the Game in a Bidding War, *supra*, at 389 (footnote omitted).

44. "The severe restrictions which this puts on a player's actual ability to play out his option is reflected in the fact that few players ever play out their options and, that, since the Dave Parks case, no player of all-league caliber has played out his option and gone to a new team." *Ibid.*

45. S.Rep.No.92–1151, 92d Cong., 2d Sess. (1972).

sive right to negotiate with and sign the player. Whereas the reserve clause prevents teams from competing for veteran players, the draft prevents bidding for rookies. The net effect of the two mechanisms is to force a player to deal only with the NBA club which "owns" the rights to him. If the player refuses to go along with the system, he will not play ball in the NBA; blacklisting or boycotting to punish the recalcitrant player or the renegade club completes the control devices used.

■ The merger and/or agreement of non-competition between the two leagues is another mechanism whose effect would be a restraint of trade. Either would result in the total elimination of competition between the two leagues for the services of college players, free agents, or those intending to break their contracts and jump leagues. The end of the bidding war between the NBA and the ABA would mean the loss of negotiating power which NBA players obtained in 1967.

■ Some degree of economic cooperation which is inherently anti-competitive may well be essential for the survival of ostensibly competitive professional sports leagues. See Flood, supra, 316 F.Supp. at 275–76. Without these mechanisms unrestrained price wars for the service of the most proficient players will ensue, or so runs the argument, with the wealthiest teams capturing the top talent and the poorer teams facing demise due to the loss of fans and profit. See The Super-Bowl and the Sherman Act: Professional Team Sports and the Antitrust Laws, 81 Harv.L.Rev. 418, 421 (1967) (hereafter Sports and the Antitrust Laws). Because survival necessitates some restraints, however, does not mean that insulation from the reach of the antitrust laws must follow. Less drastic protective measures may be the solution. See, e. g., S.Rep. No. 92–1151, 92d Cong., 2d Sess. (1972); [46] Flood, supra, 316 F.Supp. at 275–76 & n. 12; Sports and the Antitrust Laws, supra, at 424–25.

In Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) and Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), the Supreme

---

46. "Sec. 4. (a) Every individual who is already engaged in the organized professional team sport of basketball in or affecting interstate commerce has the right to enter into a contract with any person for the purpose of engaging in such sport with a particular team without agreeing to permit that person to control his right, upon the expiration of his contract, to enter into a contract with any other person for such purpose, but this subsection shall not preclude agreement upon a contract containing an option provision as authorized by subsection (b).

"(b) No member club of any professional basketball league that has been allocated the right of first negotiation with a player who has not theretofore played professional league basketball may require such player to enter into a contract of employment for a term in excess of one year with an option provision for a further period of one year only. No member club of any professional basketball league shall retain directly or indirectly or by any means or device whatsoever, any option upon the services of any player beyond the termination date contained in his contract of employment, except for the option provision contained in the first contract of employment and except for an option provision which may not be part of a uniform player contract and which is individually negotiated at the discretion of the player after the effective date hereof for a period of no more than one year after the term contained in his contract of employment.

"(c) Any provision of a contract which requires any such an individual or player (1) to agree to permit the other party to the contract to control his right, upon the expiration of that contract, to enter into a contract with any other person for the purpose of engaging in an organized professional team sport of basketball, or (2) to secure a release from the other party to the contract before entering into or performing under such a contract with any other person for such purpose, shall be unenforceable.

"(d) Any person who deprives, or conspires with any other person to deprive, an individual or player of his rights under subsection (a) or (b) shall be deemed guilty of a misdemeanor and, upon conviction, shall be fined not more than $50,000, imprisoned for not more than one year, or both."

Court formulated a "rule of reason" test. Under this approach courts were required to examine the agreement or practice in relationship to the history and economics of the industry in which it was employed. If supported by clear economic necessity, and its dominant purpose was not restraint of trade, the practice would be declared reasonable and lawful. Certain practices were found to be so anti-competitive, however, that they have been declared illegal *per se,* which leaves a court free to avoid the complicated task which follows the utilization of the rule of reason test.[47] *Compare* Kapp v. National Football League, *supra.*

 Among the practices which have been declared *per se* violations of the Sherman Act are horizontal price-fixing at the same level of competition, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); territorial division of markets, Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L. Ed. 1199 (1951); and secondary or group boycotts, Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The player draft and perpetual reserve system are readily susceptible to condemnation as group boycotts based on the NBA's concerted refusal to deal with the players save through these uniform restrictive practices. *See Klor's, Inc., supra;* Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 465, 61 S.Ct. 703, 85 L.Ed. 949 (1941). The two control mechanisms are also analogous to price-fixing devices condemned

as *per se* violative of the Sherman Act, for the draft and a perpetual reserve system allow competing teams to eliminate competition in the hiring of players and invariably lower the cost of doing business, United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); United States v. Socony-Vacuum Oil Co., *supra; see also* Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 241–42, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); American Tobacco v. United States, 328 U.S. 781, 801–803, 66 S.Ct. 1125, 90 L. Ed. 1575 (1946). In addition the player draft and a perpetual reserve system can be viewed as devices creating illegal horizontal territorial allocations and product market divisions. *See* Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L. Ed.2d 554 (1967); United States v. Sealy, Inc., *supra.*

The player draft had its only substantial test to date in Denver Rockets v. All-Pro Management, Inc., *supra.* In that case Spencer Haywood, then playing with the Rockets of the ABA, contracted to play for the Seattle team in the NBA. Haywood sought a preliminary injunction barring the enforcement of a NBA By-Law which prohibited qualified players from negotiating with any NBA club until four years after high school graduation. The court said

"There is substantial probability in light of all the evidence presented to this Court that the so-called 'college draft system' . . . constitutes a violation of the antitrust laws. . . ." 325 F.Supp. at 1056,

and declared the four-year rule to be a "group boycott" in violation of the antitrust laws.[48]

---

47. "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use . . . an inquiry so often wholly fruitless when undertaken." Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *see*

*also* Player Control Mechanisms in Professional Team Sports, 34 Un.Pitt.L.Rev. 645, 650–55 (1973).

48. The injunction was stayed pending appeal, but Justice Douglas vacated the Ninth Circuit's stay and reinstated the preliminary injunction. Haywood v. National Basketball Association, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971). In the course of his opinion Justice Douglas stated that the

A perpetual reserve clause in effect in the National Hockey League (NHL) has been held in three cases to violate the Sherman Act. In *Boston Professional Hockey Association, supra,* the court refused to enforce the reserve clause to prevent a player from jumping to the World Hockey League because the Boston Bruins had "not shown a probability that these Standard Player's Contracts will be found to be legally valid and enforceable in the face of the serious threat to their legality posed by the provisions of the Sherman Act." 348 F. Supp. at 268.[49]

In Nassau Sports v. Hampson, 355 F. Supp. 733 (D.Minn.1972), the court ruled that the reserve clause:

"seems, plausibly, one aspect of a contractual scheme constituting a violation of sections 1 and 2 of the Sherman Antitrust Act." 355 F.Supp. at 735.

In the third case, *Philadelphia Hockey, supra,* Judge Higgenbotham concluded that, as a matter of law, either a perpetual reserve system or one limited to three years' duration violates Section 2 of the Sherman Act as an unlawful monopolization. The court hesitated to declare that the NHL reserve clause was *per se* violative of Section 1, due in part to its reservation that a competitive balance among teams could be maintained in the absence of any restraints.

■ The consummation of the merger or non-competition agreement would result in the total elimination of competition in the major league market. Such complete monopolization is *per se* violative of Sections 1 and/or 2 of the Sherman Act. *See, e. g.,* United States v. First National Bank & Trust Co., 376 U.S. 665, 669–70, 84 S.Ct. 1033, 12 L.

Ed.2d 1 (1964); United States v. Grinnell Corp., 384 U.S. 563, 570–71, 576, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867, 955 (S.D.N.Y.1965). Absent special Congressional approval, mergers of rival leagues would be an antitrust violation: in 1966, the NFL and the American Football League sought to end their price war by going to Congress and getting a special exemption, 15 U.S.C. § 1291. This approach remains available, of course, to defendants.

■ A motion for summary judgment is not a substitute for a trial of disputed facts; yet partial summary judgment may be entered in an antitrust case as to those matters where evidentiary data and affidavits show no genuine issue of material fact exists. *See* Rule 56(d), F.R.Civ.P.; White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963) ("some of the law in this area is so well developed that where, as here, the gist of the case turns on documentary evidence, the rule at times can be divined without a trial"); *see also* First National Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Blalock v. Ladies Professional Golf Association, *supra*; Denver Rockets v. All-Pro Management, Inc., *supra*; Yale Transport Corp. v. Yellow Truck & Coach Manufacturing Co., 3 F.R.D. 440 (S.D.N.Y.1944).

■ While the plaintiffs have not sought summary judgment in their favor on any of the disputed issues but have merely opposed defendants' motions on the ground that genuine issues of fact render summary judgment inappropriate, the weight of authority is that a

group boycott implication involved in the draft is a significant issue. *Id.* at 1205–1206, 91 S.Ct. 672.

49. The defendants argue that the hockey cases are irrelevant, as the system of restraint is far more pervasive than that present in basketball. *See* Boston Professional Hockey Association, Inc. v. Cheevers, 348 F.Supp.

261, 267 (D.Mass.1972); *Philadelphia Hockey, supra* n. 41. The NBA, unlike the NHL, has not had to develop and maintain farm teams, for the nation's colleges provide that as a free service; that may help account for the purported difference between the sports. Insofar as a difference may exist, I find it only one of degree and not of kind.

court may, *sua sponte,* render summary judgment in favor of the opposing party despite the absence of a cross-motion. *See* Wright & Miller, *supra,* Civil § 2720, at 467–71. A barrier to taking definitive action on these issues at this time, however, is the sharp controversy between the plaintiffs and the NBA defendants as to whether the controversial restraints came into being in the context of arm's-length union-employer negotiations, or were imposed unilaterally by the NBA.

 There is a total divergence of views between plaintiffs and defendants in addressing themselves to this question. There is disagreement as to when the Players Association was recognized as the exclusive bargaining agent for the players; whether the reserve clause and the assignment of contract provisions were ever the subject of collective bargaining; whether the draft, assignment and trading provisions of the Uniform Contract, and the compensation plan are regulated by collective bargaining agreements entered into between the NBA and the players; whether the reserve clause, draft, assignment and trading provisions of the Uniform Contract, and the compensation plan have been unilaterally adopted by the NBA and imposed on the players. Whether the restraints were ever the subject of serious bargaining, or whether they were acquiesced in in return for other benefits, or whether they were baldly imposed by the NBA [50] cannot be determined except at trial.

Resolution of this conflict may be the most critical issue in this litigation. Conceivably, if the restrictions were part of the union policy deemed by the Players Association to be in the players'

best interest, they could be exempt from the reach of the antitrust laws. *See Jewel Tea, supra,* 381 U.S. at 690, 85 S. Ct. 1596; *International Container Transport Corp., supra,* 426 F.2d at 887; National Dairy Products Corp. v. Milk Drivers and Dairy Employees Union Local 680, 308 F.Supp. 982, 986 (S.D.N.Y. 1970). The proper inquiry in respect of this controversy is whether the challenged restraints were ever the "subject of serious, intensive, arm's-length collective bargaining." *Philadelphia Hockey, supra,* 351 F.Supp. at 499; *see Flood, supra,* 407 U.S. at 293–96, 92 S.Ct. 2099 (Marshall, J., dissenting); *Boston Professional Hockey Association, supra,* 348 F.Supp. at 267–68.

I must confess that it is difficult for me to conceive of any theory or set of circumstances pursuant to which the college draft, blacklisting, boycotts and refusals to deal could be saved from Sherman Act condemnation, even if defendants were able to prove at trial their highly dubious contention that these restraints were adopted at the behest of the Players Association. Plaintiffs, on their part, have vigorously asserted that no collective bargaining ever took place as to any of these restraints, and that certainly they are not the kind of matter which a union would consider, seek or obtain as being in its own best interest and that of its members. The life of these restrictions, therefore, appears to be all but over, although their formal interment must await further developments in this case. Any merger or non-competition agreement between the NBA and ABA without Congressional approval similarly would be clearly unlawful, and defendants are presently under injunctive restrictions in that regard.

50. The court disagrees with the defendants' interpretation of the Second Circuit's statement in Carroll v. American Federation of Musicians of the United States and Canada, 372 F.2d 155, 165 (2d Cir. 1967), that collective bargaining history is irrelevant. In *Carroll,* the regulations were unilaterally imposed by a union largely on persons who were members of the union. Moreover, the Court of Appeals three years later in *Intercontinental Transport, supra* n. 27, explored bargaining history, and finally ascertained who sought and obtained the provision in question. In any case, I propose to follow the course set in *Philadelphia Hockey, supra* n. 41, and *Boston Professional Hockey Association, supra* n. 49, and explore the NBA-players bargaining history.

While a perpetual reserve system would also appear to be a *per se* violation of the Act, whether such a system exists, and how it operates and came into being are unclear. Moreover, I must accept defendants' contention at this stage of the proceedings that the reserve system presently operative is limited to a one-year renewal, coupled with a compensation plan and that the system does not duplicate the Rozelle plan. *See* United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed. 2d 176 (1962); Sterling National Bank & Trust Co. v. Fidelity Mortgage Investors, 510 F.2d 870, (2d Cir. 1975). Therefore, no tentative conclusion as to the reserve system's legality will be projected prior to trial on the merits. *See* Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 472–73, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); White Motor Co. v. United States, *supra*. Accordingly, defendants' motions for summary judgment are denied.

## VII

*Motion for Class Action Determination*

Plaintiffs move, pursuant to Rule 23(c)(1), F.R.Civ.P., for a determination that this action may be maintained as a class action, either under 23(b)(1) and/or (2) and alternatively under 23(b)(3). The proposed class is comprised of all active players in the NBA from the date of the commencement of this action in April of 1970 through the present, and all future players in the NBA prior to the date of final judgment. Eleven plaintiffs are currently active players and three no longer play in the NBA.

Essentially, plaintiffs claim that defendants' illegal activities affect each plaintiff and proposed class member in a "substantially identical" manner.[51] They maintain that they and the class they seek to represent are a homogeneous group which is and has been the target of the NBA's conspiracies. NBA [52] primarily raises the four following arguments against the proposed class determination: (1) the inclusion of future players makes the class indefinable; (2) potential conflicts of interest among the class members preclude adequate representation by the named plaintiffs; (3) the class action is an inferior method for handling this controversy; and (4) the proposed class action falls without any of the Rule 23(b) categories.

A. *Is the Proposed Class Sufficiently Defined?*

It is apparent that the named plaintiffs are members of the proposed class; that common questions of law and fact are present and that the class meets the numerosity requirement. NBA contends that the class lacks sufficient definition[53], that the plaintiffs' claims are not typical of the proposed class, and that the plaintiffs will not fairly and adequately represent the interests of the members.

The NBA's claim that the proposed class lacks definition is premised on an erroneous assumption. Defendants misread a portion of the plaintiffs'

51. "[A]ll past, present and future NBA players have been and still are forced either to accept the *intra*-league anticompetitive and uniform conditions unilaterally imposed upon them by the NBA defendants or to risk forfeiting their right to earn their livelihood as professional basketball players. And, any full or partial combination or merger of the NBA and ABA or their member teams, will forever foreclose the *inter*-league competition that existed between 1967 and 1970." Plaintiffs' Class Action Memorandum at 6–7.

52. The ABA has not opposed the class action motion. It should also be noted that only injunctive relief is sought against the ABA. Complaint at 23–24.

53. In addition to the four prerequisites set out in Rule 23(a), it has been generally assumed that a definable class must exist, and that the purported representatives be members of that class. Wright & Miller, *supra*, Civil § 1759, at 573, and §§ 1760, 1761.

moving affidavit in asserting that the inclusion of future active players up to the date of judgment raises the spectre of a class hundreds of thousands strong. In the affidavit, Laurence Fleisher merely said that out of hundreds of thousands of high school and college ballplayers, fewer than fifty generally are good enough to join the ranks of the NBA each year.[54] The "monster" class cases cites by the NBA, *see, e. g.,* Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (all odd lot purchasers or sellers in a four year period); Boshes v. General Motors Corp., 59 F.R.D. 589 (N.D.Ill.1973) (all purchasers of General Motors automobiles); United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D.N.Y.1970) (all consumers of eggs), are therefore not in point.

The class is neither amorphous, nor imprecise; at the present time there are three hundred and sixty-five class members. The fact that fifty to a hundred more members may be joining the class does not make it unmanageable. *See* Price v. Skolnick, 54 F.R.D. 261, 263 (S.D.N.Y.1971). Moreover, it has been held that the "[f]ailure to state the exact number or to identify individually every member of the class does not militate against the maintenance of a class action." Herbst v. Able, 47 F.R.D. 11, 21 (S.D.N.Y.1969); *see also* Dolgow v. Anderson, 43 F.R.D. 472, 492 (E.D.N.Y. 1968); Fischer v. Kletz, 41 F.R.D. 377, 384 (S.D.N.Y.1966); Wright & Miller, *supra,* Civil § 1760, at 580. This court can determine at any time whether a particular individual is a member of the class, *see* Eisman v. Pan American World Airlines, 336 F.Supp. 543, 547 (E.D.Pa.1971), for it will always be composed of "a well-defined, discrete and limited number of NBA basketball players all of whom are well known and will be readily identifiable by exact name at all stages of this action." [55] This factor makes this case distinguishable from *Eisman, supra* (all past and future purchasers of tickets from Pan American) and from Coniglio v. Highwood Services, Inc., 60 F.R.D. 359, 363 (W.D.N.Y.1972) (all past, present and future ticketholders of the Buffalo Bills).

Courts have approved classes which included future members. *See, e. g.,* Taylor v. Safeway Stores, Inc., 333 F. Supp. 83, 84 (D.Colo.1971); Manning v. General Motors Corp., 14 F.R.Serv.2d 1083, 1085 (N.D.Ohio 1971), aff'd, 466 F.2d 812 (6th Cir. 1972), cert. denied, 410 U.S. 946, 93 S.Ct. 1366, 35 L.Ed.2d 613 (1973); Rios v. Steamfitters Local 638, 54 F.R.D. 234, 237 (S.D.N.Y.1971); *cf.* Air Line Stewards & Stewardesses Association Local 550 v. American Airlines, Inc., 490 F.2d 636, 638 (7th Cir. 1973), cert. denied, 416 U.S. 993, 94 S. Ct. 2406, 40 L.Ed.2d 773 (1974) ("class consisted of all present and former American stewardesses . . . who had been, desired to be, or would in the future desire to be, pregnant"); Arey v. Providence Hospital, 55 F.R.D. 62, 64 (D.D.C.1972) ("class action brought on behalf of all black and female employees who have sought, might have sought, seek or might seek, employment and promotion by the defendant"). In view of the size of the class and that plaintiffs have agreed to give notice of the proceedings to all present and future members, the notice requirement does not raise a serious issue.[56]

---

54. "In no other business has this type of restriction been permitted to my knowledge. These restrictions imposed great hardships on all the NBA players—who, it should be noted, are professionals possessing great skills. Of the literally hundreds of thousands of varsity high school players in the United States and of the thousands of varsity college players, each year fewer than fifty are good enough to join the NBA . . . ." Fleisher Affidavit ¶ 9.

55. Plaintiffs' Class Action Reply Memorandum at 39.

56. "[T]he notice required by Rule 23(c)(2) is a factor which may properly be considered in weighing the feasibility of management of the proposed class action." Philadelphia

## B. Typicality and Fair and Adequate Representation

Rule 23(a)(3) requires that the representatives' claims be typical of the proposed class; 23(a)(4) requires that the representatives fairly and adequately protect the interests of the members. Plaintiffs and defendants agree that the requirements of these two subsections are virtually the same, see Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562–63 (2d Cir. 1968); duPont v. Perot, 59 F. R.D. 404, 409–10 (S.D.N.Y.1973), to wit, the interests of the named plaintiffs must be co-extensive with the interests of the proposed class members, and the plaintiffs' interests may not be antagonistic or adverse to interests of the class.

Plaintiffs assert not merely co-extensive interests, but interests identical "in every material respect" to those of members of the proposed class.[57] It appears that the NBA conspiracy to monopolize professional basketball through intra- and inter-league restraints previously discussed has affected, affects, or will affect each member of the class in a similar way, and it appears that every NBA player has the same interest in ending these restraints.[58] While this conclusion is tentative, and may be altered as the case progresses to trial, it is fully supported on the record.

NBA vigorously contests this harmonious family portrait, and instead paints a seascape of stormy differences among the proposed class members. Potential conflicts between past and present play-ers, among present players, and among past players are alleged. The conflicts are of such magnitude, it is argued, that the class should not be maintained; at the very least the NBA urges the formation of a multitude of subclasses.

The first conflict purportedly arises between the active players who primarily seek injunctive, as opposed to monetary, relief and the past players who only seek treble damages. The supposed disinterest of the latter group as to the future of the NBA [59] puts them at odds with the present (and future) members, who seek a financially secure league in which to display their talents.[60] A finding of intra-class conflict here would have some support in recent cases. See Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 29 (S.D.N.Y. 1972); Van Allen v. Circle K Corp., 58 F.R.D. 562, 564 (C.D.Cal.1972); Matarazzo v. Friendly Ice Cream Corp., 62 F.R.D. 65 (E.D.N.Y.1974); Gaines v. Budget Rent-A-Car of America, 16 F.R. Serv.2d 60, 64–65 (N.D.Ill.1972); Seligson v. Plum Tree, Inc., 61 F.R.D. 343 (E.D.Pa.1973); but see McMackin v. Schwinn Bicycle Co., 1972 CCH Trade Cas. ¶ 74,220 (N.D.Ill. 1972); Jacobi v. Bache & Co., Inc., 16 F.R.Serv.2d 71 (S. D.N.Y.1972); Gardner v. Awards Marketing Corp., 55 F.R.D. 460, 464 (D. Utah 1972). In opposition, plaintiffs retort that the supposed conflict is speculative and without foundation; that there were no "past" players in the class when the suit was originally commenced; that eleven affidavits filed in response to this past-present antagonism

Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 462 (E.D.Pa.1968). In any case, plaintiffs have agreed to give notice to all members of the proposed class, including future members as they enter the NBA. Fleisher Reply Affidavit ¶ 20.

57. The plaintiffs admit, Plaintiffs' Class Action Memorandum at 15, that the amount of damages which may be awarded to each member may be different. That will not bar a 23(a)(3) or (4) determination. Leisner v. New York Telephone Co., 358 F.Supp. 359, 372 (S.D.N.Y.1973); Minnesota v. United States Steel Corp., 44 F.R.D. 559, 567 (D. Minn.1968).

58. Plaintiffs' Class Action Memorandum at 16–17.

59. "A decision sustaining the former players' position and awarding them treble damages may well bankrupt the NBA and most if not all of its members." Defendants' Memorandum in Opposition at 13.

60. Defendants also foresee possible conflicts in past players' lack of interest in preventing a merger between the ABA and NBA, and in the likelihood that the present players will abandon the suit if the reserve clause is eliminated or modified by agreement.

refute the claimed conflict; that all players, past and present, seek damages for the same acts, and also seek to eliminate those acts; that three of the named plaintiffs are past players who would insure that the interests of past players are represented; that no evidence has been introduced showing that the league would be injured, let alone destroyed, by a final adjudication either awarding damages or injunctive relief against the defendants; and finally, that former players do care what happens to the NBA.[61]

NBA next contends that "new" present players "may well believe" that this action will destroy the NBA. It is also alleged that those present players who have acquired limited approval rights over trades, and the four players with "no-cut" provisions,[62] do not have the same interests which other present players possess in challenging the restraints. Plaintiffs answer that first, the purported conflict between "new" and "old" present players is unsupported; rather, they claim that the "new" present players have interests identical to the "old" present players.[63] Second, the contract provisions negotiated by several players have nothing to do with the restraints that bottom the complaint.

NBA also claims that the past players who are now part of management in either the NBA or ABA "could hardly be expected to share the interests of other retired NBA players," [64] and raises the possibility that past players who are now playing in the ABA may favor a merger with the NBA. Plaintiffs respond with six affidavits from the "management" past players which directly contravene the assertion of antagonism.[65] The claim that ABA past players seek a merger cannot be credited since Zelmo Beaty, former NBA player and then-president of the ABA Players Association, is on record in opposing the merger,[66] and in the present status of professional basketball, players in both leagues view prospects of merger with misgivings as adversely affecting their interests.[67]

 Class action determination will not be denied, nor will the formulation of subclasses be required in the absence of a showing that the alleged potential conflicts are real probabilities and not mere imaginative speculation. *See* Green v. Wolf Corp., 406 F.2d 291, 299 (2d Cir. 1968), cert. denied, 395 U. S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 756 (1969); Price v. Skolnick, *supra*; Feder v. Harrington, 52 F.R.D. 178, 182 (S.D. N.Y.1970); Jacobi v. Bache & Co., Inc., *supra*, 16 F.R.Serv.2d at 74; *cf.* Leisner v. New York Telephone Co., 358 F.Supp. 359, 372 (S.D.N.Y.1973). I find the interests of the plaintiffs are not adverse to those of the class.

 Obviously the decision that the requirements of Rules 23(a)(3) and (4) for class action determination are met here is not embedded in stone.[68] All such determinations are merely tentative, Green v. Wolf, *supra*, 406 F.2d at

---

61. See Affidavits of McLemore, Debusschere, Loughery, Caldwell, Crawford, Egan, Wilkens, Attles and Scott.

62. If they are injured or released they still get paid.

63. See Affidavit of Meminger.

64. Defendants' Memorandum in Opposition at 20.

65. See Affidavits of Debusschere, Attles, Wilkens, Loughery, Egan and Scott.

66. Hearings on S.2373 before the Subcomm. on Antitrust and Monopoly of the Senate Comm. of the Judiciary, 92d Cong., 1st Sess., pt. 1, at 311–13 (1971).

67. See Plaintiffs' Class Action Reply Memorandum at 19.

68. "If later events demonstrate that the representatives are not adequately protecting the absentees, the court may take whatever steps it thinks necessary under Rule 23(c) or Rule 23(d) at that time." Wright & Miller, *supra*, Civil § 1765, at 625–26; *see also* Feder v. Harrington, 52 F.R.D. 178 (S.D.N.Y.1970); Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966); Sol S. Turnoff Drug Distributors Inc. v. N. V. Nederlandsche Combinatie Voor Chemische Industrie, 51 F.R.D. 227, 233 (E.D.Pa.1970).

298 & n. 10, and may be revoked or amended at a later time. Wright & Miller, *supra,* Civil § 1785, at 137–38, and cases cited therein; General Motors Corp. v. City of New York, 501 F.2d 639, 646–47 (2d Cir. 1974); City of Philadelphia v. Emhart Corp., 50 F.R.D. 232, 235–46 (E.D.Pa.1970).

■ The four-year history of this litigation is sufficient indication that the named plaintiffs and their counsel will fairly and adequately protect the interests of the class.[69]

### C. *The Suit May Properly Proceed under Rule 23(b)(1)*

Having found that the prerequisites of Rule 23(a) are met, the next inquiry is whether the suit falls under any of the three 23(b) categories. It is clear that 23(b)(2) is not applicable.

Under Rule 23(b)(2), a class action is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class," and the named plaintiffs are seeking "final injunctive relief or corresponding declaratory relief."

■ The first yardstick has clearly been met, for the NBA has acted, through the intra-league restraints, and threatens to act, through the inter-league restraints, in a consistent manner toward all the class members. But 23(b)(2) certification is inappropriate when substantial damages are claimed in addition to permanent injunctive relief.

■ All players, past and present, who constitute this class seek treble damages for Sherman Act violations; moreover, there is a distinct possibility that evidence will be adduced at trial showing that the former NBA players who initially approved this suit are only interested in monetary relief. Class actions are generally not maintainable under this provision when money damages comprise a significant, it not enormous, portion of the total relief requested.[70] The Advisory Committee has stated that 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages." [71] *See Eisen, supra,* 391 F.2d at 564. Nonetheless, some courts have allowed a 23(b)(2) class action where the requested damages were ancillary to the injunctive relief.[72] It cannot realistically be contended that treble damages sought here by over 365 persons are ancillary or appurtenant to injunctive relief.

■ Our inquiry is, therefore, limited to 23(b)(1) and 23(b)(3). Rule 23(b)(1) authorizes the maintenance of a class action where "necessary to prevent possible adverse effects, either on the parties opposing the class or on ab-

---

**69.** "The general standard appears to be that the representatives must be of such a character as to assure the vigorous prosecution or defense of the action so that the members' rights are certain to be protected. . . .

"Counsel is said to be qualified . . . if he is experienced in the particular type of litigation before the court . . . [and his] competence . . . may be demonstrated by the quality of the briefs and the arguments presented . . ." Wright & Miller, *supra,* Civil § 1766, at 633–34 (footnotes omitted). I have no trouble in holding that the named plaintiffs and their counsel have met these standards.

**70.** *See, e. g.,* Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968); Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 29 n. 9 (S.D.N.Y.1972); Graybeal v. American Savings & Loan Association, 59 F.R.D. 7 (D.D.C.1973); Goldman v. First National Bank, 56 F.R.D. 587, 592–93 (N.D.Ill.1972); Bahan v. Southern Bell Telephone & Telegraph Co., 55 F.R.D. 478, 480–81 (W.D.La.1972); Alsup v. Montgomery Ward & Co., 57 F.R.D. 89 (N.D.Cal. 1972); Bogosian v. Gulf Oil Corp., 62 F.R. D. 124, 133 (E.D.Pa.1973).

**71.** Advisory Committee's Note to Rule 23, 39 F.R.D. 98, 102 (1966).

**72.** *See, e. g.,* Robinson v. Lorillard Corp., 444 F.2d 791, 801–802 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L. Ed.2d 655 (1971); Rodriguez v. Swank, 318 F.Supp. 289, 295 (N.D.Ill.1970), aff'd, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971); Samuel v. University of Pittsburg, 56 F.R.D. 435, 440 (W.D.Pa.1972); Leisner v. New York Telephone Co., *supra,* n. 57, 358 F.Supp. at 373.

sent class members, that might result if separate actions had to be brought." Wright & Miller, *supra*, Civil § 1772, at 4. Rule 23(b)(1)(A) allows a class action when individual suits would create the possibility of inconsistent or varying adjudications that would "establish incompatible standards of conduct for the party opposing the class"; 23(b)(1)(B) seeks to avoid the risk that separate adjudications might impair the interests of other class members. The circumstances of this case, and in particular the nature of much of the relief sought, suggests that both clauses are applicable. I have already indicated that the college draft, a perpetual reserve clause, boycotts, and a proposed merger, absent Congressional approval, or a non-competition agreement are illegal. Any later decision in this case which might grant permanent injunctive relief against these or other intra-league restraints, or, as to the merger, which may convert the preliminary injunction into a final one, necessarily obviates the danger which the prosecution of separate suits engenders. Zachary v. Chase Manhattan Bank, 52 F.R.D. 532 (S.D.N.Y.1971).[73]

That separate actions could establish incompatible standards of conduct for the NBA is well within the realm of possibility. For example, if this action were allowed to continue only for the benefit of the named plaintiffs, it is conceivable that other members of the proposed class would file similar complaints in other courts.[74] The court might grant injunctive relief, another court might refuse, and a third may give relief which differs in material re-

spects from the first. Differing results in the individual actions would impair the NBA's ability to "pursue a uniform continuing course of conduct" where pragmatic considerations require that the defendants act in the same manner to all members of the class. Wright & Miller, *supra*, Civil § 1773, at 10–11. The decision of any court could also, "as a practical matter,"[75] affect the rights of the class members not before that particular court.[76]

Ample authority supports the maintenance here of a class action under Rule 23(b)(1), *see* Zachary v. Chase Manhattan Bank, *supra*; Jacobi v. Bache & Co., Inc., 16 F.R.Serv.2d 70, 71 (S.D.N.Y. 1971); Mungin v. Florida East Coast Ry., 318 F.Supp. 720 (M.D.Fla.1970), aff'd per curiam, 441 F.2d 728 (5th Cir.), cert. denied, 404 U.S. 897, 92 S.Ct. 203, 30 L.Ed.2d 175 (1971); Dale Electronics, Inc. v. R. C. L. Electronics, Inc., 53 F.R.D. 531 (D.N.H.1971); Van Gemert v. Boeing Co., 259 F.Supp. 125, 130–31 (S.D.N.Y.1966); Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 285 F.Supp. 714 (N.D.Ill.1968); Sultan v. Bessemer-Birmingham Motel Associates, 322 F.Supp. 86 (S.D.N.Y. 1970), though other cases suggest a different result, *see* Free World Foreign Cars, Inc. v. Alfa Romeo, *supra*, 55 F.R. D. at 29 n. 9 (franchise); Van Allen v. Circle K Corp., *supra*, 58 F.R.D. at 565 (franchise); Goldman v. First National Bank, 56 F.R.D. 587, 590–91 (N.D.Ill. 1972) (Truth in Lending Act); Kenney v. Landis Financial Group, Inc., 349 F. Supp. 939, 951 (N.D.Iowa 1972) (same); Rodriguez v. Family Publica-

---

73. "The prosecution of separate actions by individual members of the class could lead to inconsistent results with respect to other members of the class . . . since the finance charge exacted by defendant is either legal or it is illegal as to all members. For the same reason, an adjudication with respect to plaintiff would be, as a practical matter, dispositive of the interests of the other class members . . ." *Id.* at 534.

74. *Contra*, Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412, 415 (S.D.N. Y.1972); Goldman v. First National Bank, 56 F.R.D. 587 (N.D.Ill.1972).

75. Advisory Committee's Note to Rule 23, 39 F.R.D. 98, 101 (1966).

76. Cf. "It would be incongruous and damaging for all parties were the reserve clause and common draft, for example, to be held illegal by one or more courts as to some of the players, but legal by other courts as to other players, or that with respect to some of the players the NBA and ABA could not merge; but as to other players they could merge." Plaintiffs' Class Action Memorandum at 21.

tions Service, Inc., 57 F.R.D. 189, 192–93 (C.D.Cal.1972) (same); Alsup v. Montgomery Ward & Co., 57 F.R.D. 89, 91–92 (N.D.Cal.1972) (same); Bogosian v. Gulf Oil Corp., 62 F.R.D. 124, 131–32 (E.D.Pa.1973) (dealership). In line with the philosophy enunciated in the Second Circuit's opinions in *Eisen* and Green v. Wolf, *supra*, that Rule 23 be given a liberal construction with error, if any, on the side of certification, I hold that this action is maintainable under 23(b)(1).

Alternatively, this suit could be maintained pursuant to Rule 23(b)(3). That subsection states that a class action is maintainable when

> "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Defendants do not seriously dispute the plaintiffs' contentions that common questions exist, and predominate here. It has become almost axiomatic that allegations of conspiracy in violation of the Sherman Act satisfy the "predominance" requirement of this subsection.[77] The only argument the NBA makes in objection to certification under 23(b)(3) is that a class action would not be a "superior method" to resolve the issues raised by the complaint. The better procedure, they argue, is for the disputes to be aired through the collective bargaining process. It has been indicated tentatively, however, that these issues

are not mandatory subjects of collective bargaining. Moreover, an examination of the four factors which a court must consider in a (b)(3) determination persuades me that a class action would be both economical and proper. The first factor provides that a court must take account of the interest that individual class members may have in controlling the prosecution of this action in separate suits. Aside from the speculative musings of intra-class conflict, no claim has been made that individual members have such an interest. Indeed, every then-active player authorized the commencement of this suit in 1970; widespread player opposition to the proposed merger was also revealed in the hearings before the Senate Subcommittee on Antitrust and Monopoly.[78] The second factor calls the court's attention to the "extent and nature of any litigation concerning the controversy already commenced by or against members of the class." To my knowledge no similar litigation is currently pending before any other court, and the one case which considered an antitrust challenge to an aspect of the player draft was commenced after this complaint was filed and has since been settled.[79] Thus no threat of multiplicitous or inconsistent adjudications looms before me.

The third factor, "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," is very likely to be satisfied, too. This district is an appropriate place to focus the litigation, as more defendants have their principal places of business here than in any other district. *See*

---

77. *See, e. g.*, Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969); City of Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.J.1971); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal. 1967); Gold Strike Stamp Co. v. Christensen, 436 F.2d 791 (10th Cir. 1970); Matarazzo v. Friendly Ice Cream Corp., 62 F.R.D. 65 (E.D.N.Y.1974); City of Philadelphia v. Emhart Corp., 50 F.R.D. 232 (E.D.Pa. 1970); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.

D.Pa.1968); City of New York v. General Motors Corp., 60 F.R.D. 393 (S.D.N.Y. 1973), rev'd on other grounds, 501 F.2d 639 (2d Cir. 1974); In re Antibiotic Antitrust Actions, 333 F.Supp. 278 (S.D.N.Y.1971).

78. Hearings on S. 2373 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary, 92d Cong., 1st Sess., pt. 1, at 302–303, 317–18 (1971).

79. Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C.D.Cal.1971).

Siegel v. Chicken Delight, Inc., 271 F. Supp. 722, 725 (N.D.Cal.1967); Advisory Committee's Note to Rule 23, 39 F R.D. 98, 102–104 (1966). The last consideration calls for an analysis of the "difficulties likely to be encountered in the management of a class action." Here, the size of the class is not large enough to make administration of the suit difficult, the claims of class members are substantially the same, and the members are both identifiable and subject to notice.

There is no need, however, to determine that this class is maintainable under Rule 23(b)(3). When a choice exists between (b)(1) and (b)(3) certification, the court should order that the action proceed under (b)(1) exclusively, so that the opt-out privilege is unavailable. *See* Zachary v. Chase Manhattan Bank, *supra,* 52 F.R.D. at 534; Van Gemert v. Boeing Co., *supra,* 259 F. Supp. at 130; Mungin v. Florida East Coast Ry., *supra,* 318 F.Supp. at 730; Research Corp. v. Pfister Associated Growers, Inc., 301 F.Supp. 497, 500 (N. D.Ill.1969). Accordingly, it is ordered, pursuant to Rule 23(c)(1), that this suit be maintained as a class action under Rule 23(b)(1). The class will be comprised of the approximately 365 players who are or were active players for member clubs of the NBA from the date of the commencement of this suit to the present and those who become active players prior to the date of final judgment. Costs of notice to all class members will be borne by plaintiffs.

*Summary of Determinations*

The motion to dismiss the complaint is denied. The motion to dismiss Counts Four and Five of the complaint is granted. The motion for class action determination is granted. The motion to dissolve the preliminary injunction is denied. The motions for summary judgment are denied.

It is so ordered.